Curran, Dennis J., J.
The Maynard Retirement Board denied retirement benefits to Anthony Tyler under G.L.c. 32, §§10(1) and 15(4). That decision was reversed by a district court judge. The Retirement Board presently seeks review of that reversal under G.L.c. 249, §4. Tyler has filed a motion to dismiss which, for the following reasons, is DENIED.
I. BACKGROUND
In addition to accepting as true the factual allegations in the Board’s complaint for purposes of a motion to dismiss under Rule 12(b) (6), the court may also take into consideration the record of the district court proceedings (“Record”). Durbin v. Board of Selectmen *592 of Kingston, 62 Mass.App.Ct. 1, 4 n.5 (2004) (“In a certiorari proceeding, the pleadings contain the record on the basis of which the reviewing court decides the case”).
A.The Underlying Facts
The following underlying facts are undisputed.
Tyler was appointed as a firefighter to the Maynard Fire Department on June 12, 1987, at which time he became a member of the Maynard retirement system; he was classified as Group 2.[1] Record, at 106, 144. He was also an emergency medical technician (“EMTj.[2] Gerry Byrne was a Maynard firefighter as well, and he and his wife Lori lived next door to Tyler in Maynard, Massachusetts. Starting in about 1991, Tyler became close friends with the Byrnes and their children. On various occasions between 2002 and 2006, Tyler sexually molested the Byrne’s son and told him that if he told anyone, he could lose his wife and job. After the Byrne’s son told his parents about the repeated and longstanding pattern of Tyler’s sexual assaults, they confronted him in September 2006. Tyler admitted it.
Around that same time, in September 2006, Tyler began calling in sick to work. The Fire Department’s chief learned in October 2006 that Tyler had been arrested, but the Department did not take any action against Tyler. On October 12, 2006 a Middlesex County grand jury indicted Tyler on three counts of indecent assault and battery on a person over fourteen (2006-1375-001, 002, 003) in relation to his abuse of the Byrne’s son (“the 2006 case”).[3] Record, at 93-95.
Another of Tyler’s victims, a family friend whom Tyler had touched inappropriately repeatedly over several years, came forward in October 2006 after hearing of the 2006 case. He alleged that Tyler assaulted him in his car, at the victim’s home, and at the fire department where the victim’s uncle was stationed as a firefighter. In January 2007, a Middlesex County grand jury indicted Tyler for his assault of that victim at a charity golf tournament in September 2002, charging him with one count of rape (2007-CR-107-001) and one count of indecent assault and battery on a person over fourteen (2007-CR-107-002) (“the 2007 case”).[4]
In March 2008, Tyler pled guilty to all three counts of the 2006 case. A Superior Court justice sentenced Tyler to MCI Cedar Junction on counts 001 and 002 for two concurrent sentences of three years to three years and one day, and on count 003 to five years of probation conditions,[5] from and after the sentence imposed on counts 001 and 002. In July 2008, Tyler pled guilty to indecent assault and battery on a person over fourteen (count 002 in the 2007 case), and the Commonwealth filed a nolle prosequi on count 001, rape. A second Superior Court justice sentenced Tyler to MCI Cedar Junction for three years to three years and one day, to be served from and after the sentence in the 2006 case.
B. The Board’s Actions
On October 12, 2006, the same day as his indictment in the 2006 case, Tyler applied to the Board for superannuation retirement. Record, at 104. The Board[6] granted his application, effective October 15, 2006, in the amount of $17,402.76 per year, calculated under “Option C.”[7] Record, at 145.[8]
On May 12, 2008, the Middlesex District Attorney’s Office informed the Public Employee Retirement Administration Commission of Tyler’s March 2008 guilty pleas in the 2006 case; and on July 22, 2008, the Middlesex District Attorney’s Office informed the Retirement Commission of Tyler’s July 2008 guilty plea in the 2007 case.[9] As to both cases, the Retirement Commission related this information to the Board shortly after receiving the District Attorney’s notification.[10]
In a letter dated August 7, 2008, the Board informed Tyler that it was initiating proceedings to determine whether his convictions triggered mandatory forfeiture of his pension under G.L.c. 32, §10(1) and/or §15(4). The Board held two days of hearings on this matter, on September 10, 2008, and November 6, 2008;[11] although Tyler was represented by counsel, he chose not to attend either hearing. In a decision dated November 19, 2008, the Board unanimously concluded that Tyler was not entitled to receive a retirement allowance, and further, was required to return the amount he received after March 20, 2008 (“Board decision”).[12]
C. District Court Appeal
Under G.L.c. 32, §16(3)(a),[13] Tyler filed a petition for review of the Board decision with the Concord District Court on December 19, 2008, seeking the reinstatement of his pension.[14] He filed a memorandum in support of his petition in July 2009, and the district court held a hearing on August 26, 2009. In a deliberative decision dated May 7, 2010, the district court judge set aside the Board decision and ordered Tyler’s benefits reinstated retroactive to November 19, 2008 (“district court decision”).[15]
II. DISCUSSION A. Standard of Review
The Board filed its complaint under G.L.c. 249, §4, asserting that the district court decision reinstating Tyler’s pension was erroneous as a matter of law. In his motion to dismiss, Tyler claims that the Board has “[f]ail[ed] to state a claim upon which relief can be granted” and that the district court decision properly interpreted G.L.c. 32, Sections 10(1) and 15(4). See State Bd. of Ret. v. Woodward, 446 Mass. 698, 703 (2006) (“Woodward!’) (“The appropriate means to test the adequacy of the allegations set forth in a complaint seeking relief in the nature of certiorari is by [a] motion to dismiss”).
The Board’s opposition has the effect of a motion for judgment on the pleadings in that it describes the *593 ways in which the district court decision is erroneous by detailing the “proper” interpretation of G.L.c. 32, §15(4).[16] Thus, the resolution of Tyler’s motion decides the case: if allowed, the court concludes that the district court decision was not based on an error of law and the case is dismissed; if denied, the court concludes that the district court decision was based on an error of law, thereby quashing the district court decision and effectively reinstating the Board decision.
The standard underlying the Board’s complaint is relevant to this analysis. General Laws c. 249, §4 permits parties to bring in the Superior Court “[a] civil action in the nature of certiorari to correct errors in proceedings which are not according to the course of the common law, which proceedings are not otherwise reviewable by motion or by appeal ...” “The requisite elements for availability of certiorari are (1) a judicial or quasi-judicial proceeding (2) from which there is no other reasonably adequate remedy (3) to correct substantial error of law apparent on the record (4) that has resulted in manifest injustice to the plaintiff or an adverse impact on the real interests of the general public.” Woodward, 446 Mass. at 703-04, citing Massachusetts Bay Transp. Auth. v. Auditor of the Commonwealth, 430 Mass. 783, 790 (2000). The Board has satisfied those requirements here: it seeks review of the District Court decision, a judicial proceeding; “(t]he decision of the [District] [C]ourt shall be final[,]” according to G.L.c. 32, §16(3)(a), and thus the Board has no other reasonably adequate remedy; and the Board asserts that the district court decision is based on a substantial error of law, i.e., the misapplication and misinterpretation of G.L.c. 32, §15(4), that has resulted in manifest injustice by requiring the Board to pay Tyler his pension. See, e.g., Woodward, 446 Mass. at 704 (“These allegations adequately state a cause of action for relief in the nature of certiorari from judgments of the District Court under G.L.c. 32, §16(3)”); Durbin, 62 Mass.App.Ct. at 5 (providing for review even when a statute provides that the ruling of the court whose decision is sought to be reviewed ‘shall be final’ “ (citation and internal quotations omitted)).
“[T]he function of a court acting pursuant to G.L.c. 249, §4, is ‘not to reverse or revise findings of fact [,]’ ” Police Comm’r of Boston v. Robinson, 47 Mass.App.Ct. 767, 770 (1999), and is not “to remedy mere technical errors that have not resulted in manifest injustice.” Cumberland Farms, Inc. v. Planning Bd. of Bourne, 56 Mass.App.Ct. 605, 607 (2002), quoting Massachusetts Prisoners Ass’n Political Action Comm. v. Acting Governor, 435 Mass. 811, 824 (2002). Rather, “(t]he reviewing judge is limited to what is contained in the record of proceedings below...” Police Comm’r of Boston, 47 Mass.App.Ct. at 770. Based on that record, the court may “correct only a substantial error of law . . . which adversely affects a material right of the plaintiff’ and “rectify only those errors of law which have resulted in manifest injustice to the plaintiff or which have adversely affected the real interests of the general public." State Bd. of Ret. v. Bulger, 446 Mass. 169, 173 (2006) [“ Bulger "), quoting Massachusetts Bay Transp. Auth., 430 Mass. at 790, in turn quoting Carney v. Springfield, 403 Mass. 604, 605 (1988); Macero v. MacDonald, 73 Mass.App.Ct. 360, 366 (2008).
B. The Board Decision’s Analysis of G.L.c. 32, §15(4)
At the time of the Board decision, the leading case interpreting G.L.c. 32, §15(4), was Bulger, 446 Mass. 169. Board decision, Record, at 14.[17] In that case, the Supreme Judicial Court held that the violation resulting in forfeiture under G.L.c. 32, §15(4), had to be “related to the member’s official capacity” and required the reviewing court to look “to the facts of each case for a direct link between the criminal offense and the member’s office or position . . .” Id., quoting Bulger, 446 Mass. at 175. The retiree in that case was a clerk-magistrate convicted of perjury. Id. “The Court [in Bulger] concluded that ‘[a]t the heart of a clerk-magistrate’s role is the unwavering obligation to tell the truth’ ” and that he had forfeited his pension because his “crimes could not be separated from the nature of his particular office.” Id. (second alteration in original), quoting Bulger, 446 Mass. at 179.
The Board also discussed two decisions of the Division of Administrative Law Appeals. In the first, Cornwell v. Plymouth Ret. Bd., CR-90-837 (Dec. 15, 1991) (affirmed, Contributory Retirement Appeal Board July 10, 1992), “a firefighter committed an assault and battery on a woman and was guilty of breaking and entering in the night time.” Board decision, Record, at 15. The Division held that “[a]t the very heart of fire fighting is protection of person and property. By the criminal acts of breaking into a home to commit larceny and assaulting and battering a woman therein, the [firefighter] . . . irreparably violated the trust which must go with an individual charged with defending victims of a conflagration, who are at times helpless to help themselves and their kin.” Id., quoting Cornwell CR-90-837, at 5. The Division thus concluded that G.L.c. 32, §15(4) prevented the firefighter from receiving accidental disability retirement. Id. In the second, Shine v. Athol Ret. Bd., CR-98-383 (Contributoiy Retirement Appeal Board Dec. 15, 1993), the agency relied on Cornwell to conclude that the firefighter’s “plea of guilty ... to the charge of indecent assault on a child under the age of fourteen constitute[d] a violation of the laws applicable to his position as a fire fighter . . .” Id., quoting Shine, CR-93-383, at 3.
Turning to the case before it, the Board noted that “[t]he facts here are strikingly similar to those in the Shine and Cornwell cases. Protection of person and property is at the very heart of fire fighting; by his criminal conduct, Mr. Tyler violated the fundamental tenets of his position.” Id. at 15-16. The Board also found that “the fact that the molestations were com *594 mitted on a fellow firefighter’s son” was further evidence of a “direct link” between Tyler’s offenses and his position “[e]ven though there is no evidence that the crimes took place at the fire station, or that Mr. Tyler was ever on duiy when he committed the crimes . . .” Id. at 16.
Based on these considerations, the Board concluded that under G.L.c. 32, §15(4), Tyler was “not eligible to receive a superannuation retirement allowance.” Id.
C. The District Court Decision’s Analysis of G.L.c. 32, §15(4)
The district court decision also set out the Supreme Judicial Court’s interpretation of G.L.c. 32, §15(4), and concluded that “(t]he decisional law makes clear that pension forfeiture under §15(4) must be based on the directness of the link between a criminal conviction and a member’s position or office, rather than the gravity of the member’s offenses.” District Court decision, Record, at 325. Opining that G.L.c. 32, §15(4), would require forfeiture “where a firefighter was convicted of arson, as such conduct would constitute a violation of the laws applicable to his position [,]” id. at 326, n.3, the district court judge concluded that there was “no direct link between Tyler’s convictions and his position as a Maynard fire fighter and EMT.” Id. at 326.
The district court offered two reasons for this conclusion. First, “(a)lthough Tyler knew his victims through his fellow firefighters, his offenses were personal in nature.” Id. Second, “(t]he evidence on record indicates that Tyler’s actions underlying his indecent assault and battery convictions occurred outside the firehouse while Tyler was not on duty.” Id. For example, “(t]here is no evidence in the record that Tyler used a fire truck ... to entice a young person; or that while in uniform he importuned a young person to visit a past fire site in order to commit indecent acts . . .” Id. at 326, n.4. Such overstatements, however, do not advance the requisite analysis.
The district court also rejected the Board decision’s “oblique suggestion that Tyler’s violation[s] of the rules of the Maynard Fire Department are independent grounds upon which to deny Tyler his pension ...” Id. at 326-27.[18] Tyler’s “convictions are much graver than a mere rule violation” of the Department’s rules; “but the rules are only determinative for employment or civil service purposes, not for Chapter 32 purposes.” Id. at 327. It is “[t]he strict language of’ G.L.c. 32, and not the Fire Department’s Rules and Regulations, that “governs for purposes of the retirement laws.” Id.
The district court judge accordingly reversed the Board decision and reinstated Tyler’s superannuation benefits retroactive to November 19, 2008, id. at 328-29, concluding that “Tyler’s convictions do not constitute violations of the laws applicable to his position as a Maynard firefighter with a nexus sufficient to trigger pension forfeiture under G.L.c. 32, §15(4).” Id. at 327. In reaching this conclusion, the judge acknowledged “the deep pain to the victims and their families, [Tyler’s] abuse of the trust given to him, and his embarrassment of the Maynard Fire Department.” Id. “While it may be unfortunate that an employee, such as Tyler, who has acted so reprehensibly may receive retirement benefits, Tyler’s unbecoming conduct does not relieve [the District Court] of its duty to be faithful to the language of [G.L.c.] 32.” Id. at 328. In this respect, the district court decision is wanting.
In its conclusion, the decision offered commentaiy on the inaction of the Fire Department and the Board itself.[19] First, the judge opined that its decision “was foreordained by [the Fire Department chiefs] failure to suspend, fire, or take any disciplinary action against Tyler upon learning of Tyler’s arrest. The Chief knew that Tyler had called in sick for approximately five consecutive weeks, and he did not inquire into the validity of Tyler’s absence from work.” Id. This inaction suggested to the District Court “that those in charge likely knew about the allegations against Tyler both before and certainly after his arrest and chose not to stand in the way of his resignation and retirement, with its pension benefits.” Id.
Second, the District Court judge found “stunning” the Board’s “failure to investigate Tyler’s absence from work for the several weeks preceding his application for superannuation retirement benefits, and its granting of the benefits within day(s) after receiving Tyler’s application . ..” Id. “Even if the Board had not learned of the allegations about Tyler before his arrest and about the existence of a criminal investigation, the Board would have learned of the arrest and the underlying charges and Tyler’s continued absence from work through a simple investigation. Maynard is a small town.” Id. But such commentaiy misses the mark—it is the perpetrator Tyler’s conduct that is at issue here, not the fire chiefs.
D. Interpretation of G.L.c. 32, §15(4)
General Laws c. 32, §15(4) “refers to final criminal convictions rather than criminal offenses!,]” Gaffney v. Contributory Ret. Appeal Bd., 423 Mass. 1, 6 (1996), and provides that “[i]n no event shall any member after final conviction of a criminal offense involving violation of the laws applicable to his office or position, be entitled to receive a retirement allowance under the provisions of’ G.L.c. 32, §§1-28; G.L.c. 32, §15(4). “A member who becomes subject to the mandates of §15(4) forfeits entitlement to a retirement allowance, but the member ‘shall receive, unless otherwise prohibited by law, a return of his accumulated total deductions; provided, however, that the rate of regular interest for the purpose of calculating accumulated total deductions shall be zero.’ ” Bulger, 446 Mass. at 175, quoting G.L.c. 32, §15(4); Gaffney, 423 Mass. at 3 n.3 (noting that application of this provision “cause [s] loss of . . . future pension benefit payments and accumulated interest”). The forfeiture “is manda *595 tory and occurs by operation of law . . . [It] is an automatic legal consequence of conviction of certain offenses.” Woodward, 446 Mass. at 705 (alteration in original) (citation omitted); see id. at 708 (“The words ‘[i]n no event’ connote the absolute never or ‘under no circumstances!,]’ . . . [and] excludes all discretionary consideration” (first alteration in original) (internal citations omitted)).
The parties agree that because G.L.c. 32, §15(4) is a penal statute, “its language must be construed narrowly, not stretched to accomplish an unexpressed result.” Bulger, 446 Mass. at 174-75, citing Gaffney, 423 Mass. at 3 n.3; Collatos v. Boston Ret. Bd., 396 Mass. 684, 686-87 (1986). Although the Legislature’s intent in enacting G.L.c. 32, §15(4), was “ ‘to avoid having the precise form of the criminal enforcement action make a difference with respect to the pension forfeiture issue[,]’ . . . §15(4) [is] not limited to violations of ‘highly specialized crimes addressing official actions’ or even criminal conduct committed ‘in the course of [official] duties’. ..” Bulger, 446 Mass. at 180 (final alteration in original), quoting Gaffney, 423 Mass. at 4. At the same time, however, the Legislature “did not intend pension forfeiture to follow as a se-quelae of any and all criminal convictions.” Id. at 175, quoting Gaffney, 423 Mass. at 5. Rather, “[o]nly those violations related to the member’s official capacity” fall within the scope of G.L.c. 32, §15(4); therefore, the criminal activity must be “connected with the office or position” for G.L.c. 32, §15(4), to apply. Id. at 175 (emphases added), quoting Gaffney, 423 Mass. at 4-5.
In Gaffney, the “direct link” between the criminal offense and the plaintiffs office was clear. See 423 Mass. at 5. There, the plaintiff had pled guilty to charges that he stole money and property from the town while he was superintendent of the town’s water and sewer department. Id. at 2. His duties in that position included “the management of‘the administrative tasks of the Department,’ the preparation of the yearly budget, supervision of activities connected to the reading of water meters and the billing of customers, and the control of departmental costs." Id. at 4. “It was from these funds that [the plaintiff] stole town money for which he . . . pleaded guilty.” Id. Upon identifying this direct link between the plaintiffs offenses and his position, the Court held that G.L.c. 32, §15(4), applied to the plaintiffs pension. Id. at 5.
Discovering the “direct link” in Bulger involved more substantive discussion than in Gaffney. There, the State Board of Retirement sought the Supreme Judicial Court’s review, under G.L.c. 249, §4, of a Boston Municipal Court judge’s reversal of the board’s decision “permanently to rescind [the defendant clerk-magistrate’s] retirement allowance, and order [] [that] the board . . . reinstate [his] pension . . .” Bulger, 446 Mass. at 172-73. The board argued that the Boston Municipal Court judge “had misinterpreted G.L.c. 32, § 15 (4), and that [the clerk-magistrate] had violated the laws applicable to his position as clerk-magistrate.” Id. at 173. The question before the Court, then, was “whether, pursuant to G.L.c. 32, §15(4), [the clerk-magistrate’s] convictions of two counts of perjury and two counts of obstruction of justice in [the] [fiederal [district [c]ourt involved ‘violation[s] of the laws applicable to his office or position’ as clerk-magistrate of the Boston Juvenile Court such that he forfeited his entitlement to a retirement allowance as a member of the State employees’ retirement system.” Id. at 169 (final alteration in original).
Reiterating the established law that requires the court to look “to the facts of each case for a direct link between the criminal offense and the member’s office or position!,]” the Court began its analysis by considering the laws applicable to the clerk-magistrate’s position. Id. at 175. That position “is one created and defined by statute!,]” id., citing G.L.c. 218, §§8, 33, 35A, 58 and G.L.c. 221, §§62B, 62C; and the Code of Professional Responsibility for Clerks of the Courts, S.J.C. Rule 3:12, sets forth the “standards governing the norms of conduct and practice associated with” the position. Id. at 177-78. The Court examined those statutes and the code—which also has “the force of law[,]” id. at 177—and concluded that, “[a]t the heart of a clerk-magistrate’s role is the unwavering obligation to tell the truth, to ensure that others do the same through the giving of oaths to complainants, and to promote the administration of justice.” Id. at 179.
The Court then considered “whether [the clerk-magistrate] violated the laws applicable to his office or position when he was convicted of perjury and obstruction of justice in an arguably personal matter such that he was required to forfeit his retirement allowance pursuant to §15(4).” Id. at 178. The Court held that “[t]he nature of [the clerk-magistrate’s] particular crimes [could not] be separated from the nature of his particular office when what is at stake is the integrity of our judicial system.” Id. at 180. When the clerk-magistrate “committed the crimes of peijury and obstruction of justice, he violated the fundamental tenets of the code and of his oath of office . . ." Id. at 179. As the clerk-magistrate’s convictions “involved ‘violation[s] of the laws applicable to his office or position,’ pursuant to G.L.c. 32, §15(4), [they] mandated the forfeiture of his retirement allowance.” Id. at 180.
In contrast, the conduct at issue in Herrick v. Essex Reg’l Ret. Bd., 77 Mass.App.Ct. 645 (2010), did not involve violations of the laws applicable to the plaintiffs position. Id. at 647, 654-55. There, the plaintiff was “a maintenance mechanic and custodian” for a housing project, id. at 647, and his job afforded him access to the keys to the individual units. Id. at 654. The plaintiff “pleaded guilty to two counts of indecent assault and battery” on his daughter, a child. Id. at 647. Thereafter, the defendant retirement board denied the plaintiffs application for a superannuation *596 retirement and challenged on appeal the Superior Court’s reversal of that denial, id. at 646, arguing that the plaintiffs convictions were “directly linked to his job as a custodian for the housing project because he had access to keys to the individual units." Id. at 654; see id. at 648 (noting that the Superior Court’s decision was “comprehensive and well-reasoned”). The Appeals Court held that G.L.c. 32, §15(4) did “not apply to the circumstances” of this case because “the record [did] not show that the offenses were connected with [the plaintiffs] official capacity, nor does there appear to be the type of direct link intended by the Legislature . . .” Id. at 653, 654.
Unlike in Bulger, 446 Mass. at 180, where “the nature” of the clerk-magistrate’s position broadly obligated the plaintiff to promote the administration of justice, the nature of the plaintiffs position in Herrick, 77 Mass.App.Ct. at 654, imposed duties that were of a more limited scope. Possession of the housing project’s keys likely imposed upon the plaintiff the obligation of ensuring the safely of the property, and arguably imposed upon him the obligation of ensuring the safety of the housing project’s inhabitants. See id. On this basis, the Appeals Court found significant the facts that the offense did not occur at the housing project and that it “was not committed upon anyone who was employed by or who resided at the public property . . .” Id. at 654. The plaintiffs conduct was, in essence, a personal transgression unrelated to his position. See id. at 647, 654. Contra Bulger, 446 Mass. at 174, 179 (holding that, although clerk-magistrate’s “misconduct occurred in the context of what was arguably a personal matter!,]” his crimes “did not constitute mere personal transgressions wholly unrelated to the office of clerk-magistrate but, rather, were crimes that undermined the very essence of a clerk-magistrate’s responsibility to facilitate the administration of justice”).
E. Analysis of the District Court Decision
Preliminarily, this Court agrees with the District Court judge that the times and locations of Tyler’s offenses did not create a direct link because he did not commit those offenses at the firehouse or while on duty, and that his knowing his victims through fellow firefighters was likewise insufficient. See, e.g., Bulger, 446 Mass. at 179 (finding it was immaterial that clerk-magistrate committed offenses not as clerk-magistrate but “in the context of what was arguably a personal matter”); Herrick, 77 Mass.App.Ct. at 647, 654 (holding that location (housing project unit) and victim (housing project employee or resident) could have served as direct link because retiree was entrusted with keys to housing project units). Respectfully, however, the analysis does not end there. Instead, the district court’s decision to reinstate Tyler’s retirement benefits rested on an erroneous interpretation of G.L.c. 32, §15(4), a substantial error that, by requiring the Board to pay Tyler, has resulted in manifest injustice. G.L.c. 249, §4; Woodward, 446 Mass. at 703-04.
Following the analytical construct established by the appellate courts, this court must consider the laws applicable to the retiree’s position. Tyler was a firefighter. The parties agree that, as a firefighter, Tyler was responsible for preventing harm to people and property. Tyler claims that his responsibility is limited to situations involving fire; the Board defines it more broadly as protecting people. The Board is correct: the public safety obligations of a firefighter extend beyond the simple context of a fire, and Ttyler’s commission of sexual assaults on others contravenes this obligation. Contra Herrick, 77 Mass.App.Ct. at 654 (holding that plaintiffs offenses were not connected to his official capacity where his obligations as custodian were limited to housing project where he worked). Just as in the district court decision, however, the Board decision did not go far enough in considering the issue.
General Laws c. 48, §42 states that the chief of a fire department “shall have charge of extinguishing fires in the town and the protection of life and property in case of fire.” The chief has “full and absolute authority in the administration of the department, [and] shall make all rules and regulations for its operation . . .” Id. Pursuant to this statute, the Fire Department has promulgated rules and regulations to which the firefighters must adhere. See Maynard Fire Department Rules and Regulations, §13.02 (Record, at 129) (“Every person appointed to the [Fire] Department shall abide by the Rules and Regulations of the [Fire] Department. . .’’¡Rules and Regulations, §15.01 (Record, at 130) (“It shall be the duty of members of the . .. Fire Department to become thoroughly familiar with the provisions of these Rules and Regulations . . .”); Rules and Regulations, §15.13 (Record, at 131) (“Members and employees of the [Fire] Department shall be held responsible for the proper performance of duties assigned to them and for strict adherence on their part to these or any other rule or regulation ”) [20]
The Foreword to these Rules and Regulations describes afire department as “a uniformed organization engaged in inherently hazardous duties, related to the protection of life and property within the community . . . This concept also explains the high regard that a well run department, manned by conscientious people, may expect to receive from the citizens of the community in which it serves.” Rules and Regulations (Record, at 110). With the latter statement, the Fire Department expressly acknowledges the trust accorded the firefighters by its community. Contra Herrick, 77 Mass.App.Ct. at 654 (finding “no connection or direct link to [plaintiffs] official position” as a custodian where that position limited his duties to housing project and its residents).
As a consequence of this position of trust, the Fire Department places on its firefighters additional obli *597 gations beyond “the protection of life and property in case of fire." G.L.c. 42, §48. Among the “offenses [that] are strictly forbidden” are “[c]onduct unbecoming a member, whether on or off duty, which tends to lower the service in the estimation of the public!,]” (Rules and Regulations, §15.58(A) (Record, at 139), “[violation of any criminal law[,]” (Rules and Regulations, §15.58(D) (Record, at 139), or “[cheating discord or lack of harmony.” Rules and Regulations, §15.58(V) (Record, at 139). Clearly, Tyler’s guilty pleas in the 2006 and 2007 cases meet all three qualifications: they are “strictly forbidden" offenses that violate the criminal law, “tend []to lower the service” in the public’s eyes, and “create discord or lack of harmony” within the Fire Department.
The Maynard Fire Department Rules and Regulations governing Tyler’s conduct as a firefighter provide a “direct link” between Tyler’s criminal offenses and his position, enabling this court to conclude that Tyler’s “criminal offense[s] involved] violation[s] of the laws applicable to his office or position . . .” G.L.c. 32, §15(4). The district court judge’s dismissal of these Rules and Regulations as “determinative for employment or civil service purposes, not for Chapter 32 purposes” is therefore erroneous, as is its ultimate conclusion that there is no direct link. District Court decision, Record, at 327. As the Supreme Judicial Court demonstrated in Bulger, consideration of a position’s rules of conduct are relevant to determining whether the criminal offense has a “direct link” to the individual’s position such that G.L.c. 32, §15(4), precludes entitlement to retirement benefits. See 446 Mass. at 177-79; cf. Falmouth v. Civil Serv. Comm’n, 61 Mass.App.Ct. 796, 801-02 (2004) (holding that police department’s “standards [of conduct] themselves are critical to the proper functioning of the police force” and apply “to off-duty as well as on-duty officers” and that violation of standards “was not only a stain upon [officer’s] personal record, but reflected upon the [police] department as a whole”).
Even if the duties stemming from the role of firefighter are artificially limited to fire-related matters, Tyler was not only a firefighter but also an EMT, which removes the “fire-related” limitation. Moreover, both of these positions exist in the broader context of the civil service system, G.L.c. 31, which affords significant job protections in exchange for “selecting public employees of skill and integrity . . .” Cambridge v. Civil Serv. Comm’n, 43 Mass.App.Ct. 300, 304-05 (1997); see Horrigan v. Mayor of Pittsfield, 298 Mass. 492, 498 (1937). The public has an interest “in having only public officers and employees of good character and integrity ...” Commissioner of Metro. Dist. Comm’n v. Director of Civil Serv., 348 Mass. 184, 193 (1964) (analyzing precursor to G.L.c. 31).
“Good character and integrity” are not mere words. They are the living and working embodiment of the trust which we repose in our public safety officials— whether they are probation officers, police officers, or firefighters. The public—by its hard-earned tax dollars—deserves as much. Tyler destroyed that trust that the public placed in him as a public safety official; and he has severed that bond with his fellow firefighters.[21] See Rules and Regulations Foreword (Record, at 110).
Public protection is the essence of a firefighting, just as trust is its lifeblood. Firefighters are viewed by many as heroes: they risk their lives for their communify and their fellow firefighters; they live and eat in close quarters; they are obliged to maintain a constant edge of vigilance; and their lives and safety are inextricably linked with their fellow firefighters. Who can rationally deny that public protection is paramount among their duties? And who can plausibly question that trust flowing from the communify and their fellow officers is utterly indispensable to the proper performance of those duties?
As a firefighter and an EMT, Tyler had an obligation to protect members of the Maynard communiiy from harm. Tyler’s commission of the criminal offenses underlying the 2006 and 2007 cases—crimes against the sanctity of the person—violated that obligation and the laws governing his position.
For these reasons, the district court decision is quashed and under G.L.c. 32, §15(4), Tyler is “not entitled to receive a retirement allowance” as determined by the Board. That portion of the Board decision concerning G.L.c. 32, §15(4) contains an insufficient analysis of the laws applicable to Tyler’s position. Accordingly, this court will not simply reinstate the Board decision but instead, remand this matter to the Board for further action including, but not limited to, the adoption of this court’s decision.
ORDER
For these reasons, it is ORDERED that Tyler’s motion to dismiss is DENIED, the District Court decision is QUASHED, and the matter is REMANDED to the Board for action consistent with this decision.

Members of Group 2 are set forth in G.L.c. 32, §3(g), and include “ambulance attendants of a municipal department who are required to respond to fires and perform duties assigned to them . . .” On his October 2008 Application for Voluntary Superannuation Retirement, Tyler left blank the spaces where he was to identify his group number and the amount of “creditable service” in that position, and he left blank the section asking if he was employed by other Massachusetts governmental units or political subdivisions. Record, at 104-05.

On his October 2008 Application for Voluntary Superannuation Retirement, Tyler indicated that his position with the Fire Department was that of firefighter/EMT.

Commonwealth v. Tyler, Crim. No. 06-CR-1375 (Middle-sex Super.Ct.).

Commonwealth v. Tyler, Crim. No. 07-CR-0107 (Middle-sex Super.Ct.).

The probation terms prohibited Tyler from having any contact with children under the age of sixteen years (with the *598 exception of his grandchildren), and required sex offender evaluation and treatment, and a mental health examination.

More accurately, the Public Employee Retirement Administration Commission approved Tyler’s application, and informed the Board of its approval in a letter dated October 20, 2006. Record, at 145.

The terms of Option C, “Joint and Last Survivor Allowance,” are set forth in G.L.c. 32, §12(2).

The parties do not dispute the propriety of Tyler’s retirement application. However, it is unclear to this court how Tyler could retire on these facts (there is no mention of another job that may have increased his service to twenty years).
Curiously, the Application for Voluntary Superannuation Retirement that Tyler submitted on October 12, 2006, suggests that Tyler did not satisfy the “Eligibility Requirements for Superannuation Retirement.” Tyler’s date of birth is May 25, 1962, his employment with the Fire Department began on June 12, 1987 and therefore, as of the effective date of his “retirement,” October 15, 2006, Tyler was forty-four years old, and he had worked for the Fire Department for nineteen years and four months. The application sets forth the following eligibility requirements:
If you are a member of Group 1 or 2, you are eligible to retire at any age with at least twenty years of creditable service. [2] If you last became a member of a retirement system prior to January 1, 1978 you may, as a member in service, retire at 55 with any number .of years of service. [3] If you last became a member of a retirement system on or after January 1, 1978 and you have less than 20 years of creditable service, you must have at least ten years of creditable service and. be at least age 55 to retire. [41] If you are a member of Group 4, you are eligible to retire at any age with 20 years of creditable service or at age 55. The amount of your allowance depends on your age, creditable service, group classification and salary.
Record, at 104 (emphasis added).
Tfyler did not satisfy any of these four possible situations. First, he did not have twenty years of creditable service with the Fire Department. See G.L.c. 32, §4(l)(a) (providing that individuals cannot “be credited with more than one year of creditable service for all such membership service rendered during any one calendar year”). Second, he did not become a member of the retirement system before Januaiy 1978, but, in any event, he was under fifty-five years of age. Third, he had more than ten years and less than twenty years of creditable service, but he was under the age of fifty-five. Finally, again, he had neither reached the age of fifty-five nor accrued twenty years of creditable service.
Given the questions raised by these facts, the Court invites the parties to submit memoranda addressing this issue, and reserves the right to modify this decision. Such memoranda are due twenty-one (21) days from the date of this ruling.

The Middlesex District Attorney’s Office notified the Retirement Commission under G.L.c. 32, §15(5).

The Record also contains a letter from the Board’s attorney to the Middlesex District Attorney’s office seeking formal notification regarding Tyler’s guilty plea in the 2007 case which the Board learned of through media reports. Record, at 86. This letter is dated July 25, 2008, one day after the Retirement Commission’s letter to the Board relaying the information concerning the 2007 case; presumably, the letters crossed in the mail.

 xThe Board held this hearing in executive session. Record, at 39 (September 10, 2008); Record, at 163 (November 6, 2008).

The court will discuss the details of the Board decision in Section II, entitled “Discussion” in the context of the statutory analysis.

General Laws c. 32, §16(3) (a) provides, in pertinent part:
[A]ny member who is aggrieved by any action taken or decision of a board or the public employee retirement administration commission rendered with reference to his dereliction of duty as set forth in Section fifteen, may, within thirty days after the certification of the decision of the board, bring a petition in the district court within the territorial jurisdiction in which he resides praying that such action and decision be reviewed by the court. After such notice as the court deems necessary, it shall review such action and decision, hear any and all evidence and determine whether such action was justified. If the court finds that such action was justified the decision of the board or the public employee retirement administration commission shall be affirmed; otherwise it shall be reversed and of no effect. If the court finds that such member was unjustifiably retired, removed or discharged from his office or position he shall be reinstated thereto without loss of compensation. The decision of the court shall be final.

Tyler v. Maynard Ret. Bet, Civil No. 0847-CV-0714 (Dist.Ct.Dept.Concord Div.).

The court will discuss the details of the district court decision in Section II, infra.

As noted below, the Board conceded in its opposition “that the failure of the employer to remove or discharge Tfyler from employment, for whatever reason, prevents the application of the moral turpitude prohibition of Section 10(1) to Tfyler’s retirement.” Board Opposition, at 5.

For purposes of consistency, this court will cite to the page numbers as they appear in the Record for both the Board decision and the district court decision.

The district court judge likely characterized the suggestion as “oblique” because the Board mentioned the Fire Department’s Rules and Regulations only once, in ¶2 of its Findings of Fact: “At all pertinent times, the rules and regulations of the Maynard Fire Department prohibit conduct unbecoming a member, whether on or off duty, which tends to lower the service in the estimation of the public. The rules and regulations also prohibit violation of any criminal law . . .” Board decision, Record, at 9.

Although this commentary is more relevant to the District Court’s analysis under G.L.c. 32, §10(1), the court includes it for the sake of completeness.

Section 15.46 of the Maynard Fire Department Rules and Regulations states that “(e]very person appointed to the [Fire] Department shall, before entering upon his/her duties, make and subscribe to the oath of office, sign an agreement to abide the Rules and Regulations as they are or may be established, and be subject to any penalties imposed by the Chief of the [Fire] Department for violations thereof.” Record, at 136. At the September 2008 hearing before the Board, the Fire Department’s chief helpfully stated that he conducted an informal poll of some Fire Department firefighters and “either most of them said that they hadn’t taken an official oath or don’t even remember putting their right hand up taking an oath . . . [and he was] quite sure that Tfyler didn’t [take the oath].” Record, at 43.

Those regulations prohibit “[c]onduct unbecoming a member, whether on or off duty, which tends to lower the service in the estimation of the public” and conduct “[cheating discord or lack of harmony.” Rules and Regulations, §15.58(A) (Record at 139).