NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12035

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 509  vs. DEPARTMENT OF MENTAL HEALTH & others.[1]


Suffolk.      September 6, 2016. - November 22, 2016.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, & Budd, JJ.


Privatization Act.  Commissioner of Mental Health. Commonwealth, Contracts.  Contract, Validity.  Public Employment.  Laches.  Practice, Civil, Judgment on the pleadings.



Civil action commenced in the Superior Court Department on February 15, 2012.

Following review by this court, 469 Mass. 323 (2014), the case was heard by Janet L. Sanders, J., on motions for judgment on the pleadings.

---

[1] Advocates, Inc.; Alternatives Unlimited, Inc.; Bay Cove Human Services; The Bridge of Central Mass, Inc.; Brien Center, Brockton Area Multi Services, Inc.; Carson Center for Human Services; Center for Human Development, Inc.; Community Counseling of Bristol County; Community Healthlink, Inc.; Edinburg Center, Inc.; Eliot Community Human Services, Inc.; Fellowship Health Resources, Inc.; Mental Health Association of Greater Lowell, Inc.; North Suffolk Mental Health Association; Riverside Community Care, Inc.; Servicenet, Inc.; South Shore Mental Health Center, Inc.; and Vinfen Corporation.

The Supreme Judicial Court granted an application for direct appellate review.

Ian O. Russell (Katherine D. Shea with him) for the plaintiff.

Iraida J. Álvarez, Assistant Attorney General, for Department of Mental Health.

Carl Valvo & Ariel G. Sullivan, for Advocates, Inc., & others, were present but did not argue.

Mark G. Matuschak & Robert Kingsley Smith, for Pioneer Institute, Inc., were present but did not argue.

Anita S. Lichtblau & Robert E. Cowden, III, for Massachusetts Council of Human Services Providers, Inc., & others, amici curiae, submitted a brief.

LENK, J.  This is the second time that the plaintiff labor union appeals from dismissal of the declaratory judgment action it first brought against the Department of Mental Health (DMH or agency) in 2012.  Service Employees International Union, Local 509 (SEIU or union) maintains that certain contracts DMH made in 2009 with private vendors are "privatization contracts" subject to the requirements of the Pacheco Law, G. L. c. 7, §§ 52-55.  The Pacheco Law establishes certain prerequisites that agencies must meet when seeking to enter into privatization contracts.  Because DMH had determined that the subject contracts were not privatization contracts, however, it did not comply with those statutory prerequisites.  In bringing this action, the union seeks, among other things, a declaration invalidating the contracts on the basis of G. L. c. 7, § 54 (§ 54), which

provides that no privatization contract "shall be valid" where an agency did not follow the necessary procedures.

In our previous decision in this case, Service Employees Int'l Union, Local 509 v. Department of Mental Health, 469 Mass. 323, 324 (2014) (SEIU I), we rejected DMH's contention that the union lacked standing to challenge, in a declaratory judgment action, the agency's unilateral determination that the contracts were not privatization contracts.  While recognizing that the Pacheco Law does not expressly provide a private right of action, we also recognized that the Legislature did not contemplate the situation presented there (and here), in which an agency determines on its own that it need not comply with the requirements of the statute.  Id. at 335-336.  Because unreviewable agency decision-making on such a matter would thwart legislative intent, we concluded that in these circumstances "declaratory judgment is an appropriate vehicle for relief to ensure that agencies may not evade the requirements of the Pacheco Law with impunity."  Id. at 336.  We accordingly vacated the judgment of dismissal and remanded the case to allow joinder of necessary parties.[2]  Id. at 339.

_____

[2] The Superior Court judge had determined, and we agreed, that the initial complaint did not include all necessary parties.  Service Employees Int'l Union, Local 509 v. Department of Mental Health, 469 Mass. 323, 338-339 (2014) (SEIU I).  On remand, SEIU filed an amended complaint joining those parties.

While SEIU I was under advisement in this court, however, the five-year term of the subject contracts drew to an end and, pursuant to the provisions of those contracts, DMH exercised options renewing them for successive one year periods.[3] Following our decision in SEIU I and the amendment of the complaint, DMH again successfully moved to dismiss the union's declaratory judgment action, this time asserting it was moot. The basis for the dismissal was two-fold:  first, the action was moot as to the now-expired 2009 contracts, and, second, the remaining extant renewal contracts were immune from challenge by virtue of G. L. c. 7, § 53 (§ 53) ("any agreement renewing . . . a privatization contract[] shall not be considered a privatization contract").  The union appealed, asserting, in essence, that because the non-compliant 2009 initial contracts are invalid under § 54, so too are any renewal contracts made pursuant to them.

We are thus called upon to construe §§ 53 and 54 as they apply in these unusual circumstances.  Cognizant that the Pacheco Law only contemplates the situation, unlike this one, where an agency recognizes a potential privatization contract as

---

[3] The 2009 contracts were for a period of five years, expiring in 2014.  They provided the Department of Mental Health (DMH) three unilateral options to renew for periods of one year each.

such and acts in compliance with the statutory requirements to assure its validity, see, e.g., SEIU I, 469 Mass. at 329-330; Massachusetts Bay Transp. Auth. v. Auditor of the Commonwealth, 430 Mass. 783, 784-787 (2000) (MBTA), we interpret §§ 53-54 with that framework in mind.  Fidelity to the intent and purpose of the Legislature in enacting the Pacheco Law, evident in both the plain language of the statute when read as a harmonious whole, and the legislative history, requires that the protection afforded renewal contracts by § 53 not be extended to those renewal contracts made pursuant to timely challenged and subsequently invalidated privatization contracts under § 54.  We accordingly vacate the judgment of dismissal.

1.  Background.  The following facts are taken from SEIU's amended complaint, which, at this stage, we assume to be true, see, e.g., Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), supplemented by undisputed facts in the record.[4]  For more than fifteen years, DMH had employed case managers to provide services to individuals with mental illness.  In late 2008 and early 2009, DMH initiated a new program, the Community Based Flexible Supports program, that was intended to

_____

[4] The allegations in the amended complaint are materially identical to those in the initial complaint.  See Service Employees Int'l Union, Local 509 v. Department of Mental Health, 469 Mass. 323, 324,326 (2014) (SEIU I).

provide similar but more personalized services to DMH clients. As part of the Community Based Flexible Supports program, DMH entered into agreements with nineteen private organizations to provide services substantially similar to those previously provided by the case managers. Over the same period, DMH laid off approximately eighty case managers. DMH unilaterally determined that these new contracts were not "privatization contracts" within the meaning of the Pacheco Law and therefore did not attempt to follow any of the procedures that the law requires when an agency intends to privatize a service.

Sometime in 2009, SEIU notified the Auditor of the Commonwealth of DMH's intent to enter into the contracts and the union's objections to the contracts. The Auditor's office undertook an investigation and, in September, 2010, the Auditor's general counsel sent DMH, SEIU, and the Attorney General a letter and memorandum stating that the contracts "[had] the effect . . . of privatizing services previously performed by public employees," and therefore should have been submitted for review prior to taking effect. The Auditor's office told the Office of the Attorney General "to take whatever steps [the Attorney General felt] were appropriate," but the Attorney General's office did not take any action.

Having failed to obtain relief through administrative channels, the union filed its initial complaint in 2012. As

discussed, a Superior Court judge dismissed that complaint for lack of standing; we vacated the decision, concluding that the union did have standing, and remanded for further proceedings. On remand, a different Superior Court judge dismissed the amended complaint, this time as moot; SEIU appealed, and we granted direct appellate review.

2. Discussion. We have discussed at some length in prior decisions the statutory framework, purpose, and history of the Pacheco Law. See SEIU I, 469 Mass. at 329-330; MBTA, 430 Mass. at 785-787. In brief, G. L. c. 7, § 52 (§ 52), sets forth the purpose of the law:

> "The [G]eneral [C]ourt hereby finds and declares that using private contractors to provide public services formerly provided by state employees does not always promote the public interest. To ensure that citizens of the [C]ommonwealth receive high quality public services at low cost, with due regard for the taxpayers of the [C]ommonwealth and the needs of public and private workers, the [G]eneral [C]ourt finds it necessary to regulate such privatization contracts in accordance with [the rest of the law]."

In addition to defining several key terms, the other three sections of the law, set forth both the procedures that agencies must follow when seeking to enter into privatization contracts and describe the independent review process that the Auditor is to conduct of a proposed privatization contract upon receiving from the agency specified information and a certification of compliance with those prerequisites.

Section 53 defines "privatization contract" as follows:

> "[A]n agreement or combination or series of agreements by which a non-governmental person or entity agrees with an agency to provide services, valued at [an amount to be adjusted for inflation, currently $500,000, or more] which are substantially similar to and in lieu of, services theretofore provided, in whole or in part, by regular employees of an agency."

It excludes from the definition "[a]ny subsequent agreement, including any agreement resulting from a rebidding of previously privatized service, or any agreement renewing or extending a privatization contract."[5]  Id.  Section 54 makes plain that "[n]o agency shall make any privatization contract and no such contract shall be valid unless the agency [follows requisite procedures]."  This point is underscored in G. L. c. 7, § 55 (§ 55), which sets forth the consequence of the Auditor's objection to a proposed contract:  "An agency shall not make any privatization contract [to which the auditor objects] and no such contract shall be valid."

DMH contends that, even if the initial 2009 contracts were deemed invalid, the now fully performed contracts should not be deemed void.  It is DMH's view that the renewal contracts would remain unaffected even in the face of such a declaration because

---

[5] In addition to renewal contracts, certain contracts for services such as information technology, legal services, consulting, engineering, or design are excluded from the definition of "privatization contract."  G. L. c. 7, § 53.

renewal contracts are not privatization contracts by definition, and therefore need not comply with Pacheco Law requirements. Accordingly, in its view, the renewal contracts cannot be set aside by virtue of either their own noncompliance with such requirements or that of the predecessor contracts.  The union maintains, by contrast, that the invalidity of the initial privatization contracts requires that they be set aside as void, that they could not give rise to validly exercised options to renew and therefore that such renewal contracts are themselves void.  Section 53, the union argues, does not provide a safe harbor immunizing such renewal contracts from the consequences of predecessor agreements' invalidity.

Assuming, as we must at this stage, that the contracts DMH entered into with private vendors in 2009 were privatization contracts[6] and that, pursuant to § 54, "no such contract shall be valid," the questions we must resolve are these.  Is the consequence of declaring a non-compliant privatization contract invalid to render it void and of no effect?  If the answer is in the affirmative, are renewal contracts that are entered into

---

[6] The question whether the services provided through the Community Based Flexible Supports program are substantially similar to those provided by case managers, and therefore whether the contracts were, in fact, privatization contracts under the Pacheco Law, has not been determined, see SEIU I, 469 Mass. at 325 n.4, and we do not reach it today.

pursuant to the exercise of rights in an invalid contract themselves thereby to be set aside?  If the answer is in the affirmative, does the language of § 53 nonetheless create a safe harbor, as it were, for these renewal contracts?

We address each question in turn, interpreting the statute "according to the intent of the Legislature, ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated."  Commonwealth v. Mogelinski, 473 Mass. 164, 169 (2015) (Mogelinski II), quoting Commonwealth v. Clark, 472 Mass. 120, 129 (2015).  We construe the Pacheco Law in order to render it "an effectual piece of legislation," able to accomplish legislative aims (citation omitted).  Sun Oil Co. v. Director of Div. on the Necessaries of Life, 340 Mass. 235, 238 (1960).

a.  The invalid 2009 contracts and voidness.  Under the plain language of § 54, no privatization contract made by an agency "shall be valid" unless it is compliant with the requirements of the statute.[7]  Given that the 2009 contracts are

---

[7] Even where, unlike here, an agency acknowledges a contract as a privatization contract and unsuccessfully attempts to comply with those requirements by, inter alia, submitting it to

assumed for these purposes to be non-compliant privatization contracts, they must be considered invalid.

Generally speaking, whether a contract made in violation of a statute is rendered void ab initio, i.e., treated as having no force or effect, depends upon the language of the statute and the nature of the violation.  See Baltazar Contractors, Inc., v. Lunenburg, 65 Mass. App. Ct. 718, 720-721 (2006) (contract void where statute declares it so or where voiding contract necessary to accomplish statutory purpose).  See also Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 55 (1991) (absent statutory declaration or binding precedent "voiding ab initio . . . applied . . . with the view of . . . effectuating public policy").[8]  The language that the Legislature chose to use in both § 54 and § 55 (that "no agency shall make any privatization contract and no such contract shall be valid" [emphasis

---

the Auditor for review, the result of the Auditor's objection is the same:  "no such contract shall be valid."  See G. L. c. 7, § 54.

[8] DMH and the service providers rely on Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 56 (1991) to argue against the "legal fiction" of retrospectively declaring contracts void ab initio.  While the court did caution in that case against "unthinkingly" voiding contracts, that discussion was with respect to the effect of an invalid contract on a third party (citation omitted).  Id. at 55.  The court explained that "limits [to retroactive voiding] . . . have their typical application to the rights and duties of" third parties.  Id. at 56, quoting Sleicher v. Sleicher, 251 N.Y. 366, 369-370 (1929).

supplied]) makes it unmistakably clear that the statute was intended to be "prohibitory," so as to render any contract in violation of it absolutely void, rather than simply "directory." See Baltazar, 65 Mass. App. Ct. at 721.

This is especially so when viewed in light of the Legislature's stated purpose in § 52 that, in order to protect taxpayers, recipients of services, and workers, "it is necessary to regulate such privatization contracts" by means of the provisions set forth in the remainder of the statute. Were non-compliant privatization contracts to be afforded continuing force and effect, the result would thwart the express statutory purpose, allowing agencies to "evade the requirements of the Pacheco Law with impunity." SEIU I, 469 Mass. at 336. Deeming such contracts to be void ab initio is therefore necessary to accomplish the statute's purposes. Cf. Phipps Prods. Corp. v. Massachusetts Bay Transp. Auth., 387 Mass. 687, 691-692 (1982) (voiding public contracts that did not meet statutory bidding requirements [which serve similar purpose as Pacheco Law], even where no harm shown).

b. Status of renewal contracts. It is undisputed that the renewal contracts were made by DMH's exercise of rights under the 2009 contracts, which for purposes here are deemed invalid and void. Were such invalidation to have been the result of a declaratory judgment entered during the term of the 2009

contracts, we have little doubt but that such void contracts would be deemed without force or effect, and that they would no longer give rise to rights to renew. See, e.g., Winslow v. Baltimore & Ohio R.R. Co. 188 U.S. 646, 657-659 (1903). The inquiry then is whether the same result should obtain where, as here, the options to renew were exercised before the already-challenged 2009 contracts were declared to be invalid. We conclude that it should.

The fact that we confront this issue at a time when the 2009 contracts have expired only underscores the highly unusual circumstances here. As we noted in SEIU I, "the Pacheco Law . . . provides a streamlined and time-sensitive process . . . . [T]he . . . need for expedition in settling questions . . . is evident." SEIU I, 469 Mass. at 337 n.12. The statutory framework contemplates that an agency seeking to privatize functions will follow the procedures outlined and, if there is a challenge to the Auditor's independent review of the proposed contract, that an action in the nature of certiorari will be filed and adjudicated promptly, protecting the many interests at stake. See MBTA, 430 Mass. at 786-787, 790-791. On the other hand, "it seems plain that the Pacheco Law as written does not contemplate the situation presented here." SEIU I, 469 Mass. at 327.

In light of the fact that the parties find themselves in a situation not expressly addressed in the statute, it is hardly surprising that the union's challenges to DMH's unilateral decision to forego the Pacheco procedures began by raising the issue first with DMH and the Auditor and, thereafter, by awaiting enforcement action from the Attorney General. Cf. MBTA, 430 Mass. at 791 (law entrusts Auditor with "broad grant of power"). The union brought suit in 2012 only when those efforts proved fruitless. The union's standing to bring the action was then litigated, and it was only in 2014, after the 2009 contracts already had expired and DMH had exercised its contractual options, that we clarified the procedure to be followed in these circumstances. See SEIU I, 469 Mass. at 335-336. We would not expect to confront such a situation again, given that in the future the agency's determination that a contract is not a privatization contract may be challenged forthwith in a declaratory judgment action with injunctive relief available. Parties entering into any such contracts, let alone exercising rights of renewal, prior to adjudication of the challenge, would do so at their peril.

That being said, this is not a case where the litigation was brought to challenge renewal contracts in the first instance on the basis that the predecessor contracts were invalid. To the contrary, the union challenged the predecessor 2009 contracts

well before their expiration and now, only due to delays in adjudication, challenges the vitality of the extant renewal contracts. DMH and the vendors entered into those renewal contracts fully aware of the challenges lodged to the validity of the contracts pursuant to which the options to renew were exercised. In essence, DMH would have the result turn on the fortuity of the clock running out on the 2009 contracts before the litigation concluded. We fail to see how it serves the purpose of the Pacheco Law to permit the passage of time to be dispositive in such circumstances. See Mogelinski II, 473 Mass. at 169 (looking to statutory purpose). Cf. Commonwealth v. Vega, 449 Mass. 227, 233 (2007) (courts do not interpret statute to produce an illogical result); 2A N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 45:12 (7th ed. rev. 2014).

The union's claim that the 2009 contracts are invalid and that they and the resulting renewal contracts are thereby void, gives rise to a live controversy. SEIU has a legally cognizable interest in the outcome of a declaration as to the validity and voidness of the 2009 contracts. Such a declaration implicates the consequent inability of DMH effectively to have exercised rights of renewal pursuant to such contracts and, insofar as such a declaration would permit any such ongoing renewal contracts to be set aside, would itself provide a remedy. In

these circumstances, declaratory relief is not merely advisory and the union's claim is not moot.

c.  The impact of Section 53.  DMH maintains, however, that because all subsequent agreements, including the renewal contracts here, are not "privatization agreements," and thus are not required to comply with §§ 54-55, they therefore are immune from the effects of a declaration as to the invalidity and voidness of the initial agreements pursuant to which they were made.  This reading is not supported by the plain language of § 53 itself, by the statute read as an harmonious whole, or by legislative history.

We have no quarrel with the view urged by DMH that the language of § 53 is fairly read as subjecting to statutory requirements and review processes only new privatization agreements, entered into after the statute became effective, that privatize for the first time services that were until then provided by government employees.  "Any subsequent agreement" continuing those privatized services is "not a privatization contract."  G. L. c. 7, § 53.  By statutory definition, certain new agreements, such as those involving information technology, legal, or consulting services, also are not privatization

contracts.[9]  See id.  As to subsequent agreements, of which renewal agreements are a subset, the use of the word "any" as a modifier is certainly consistent with the reading that all such agreements are exempt.  See Hollum v. Contrib. Retirement Appeal Bd., 53 Mass App. Ct. 220, 223 (2001).  Contrary to the defendants' view, however, subsequent agreements are not exempt from all challenges.  By contrast, because they are not required to comply with the rigorous strictures and review processes of the Pacheco Law, they are exempt only from challenges based on their own noncompliance with that law.

There is nothing in the language of § 53 that renders the exempt categories bullet proof from challenges that may be made to contracts as such.  The exempt agreements, as any contracts, are subject to all manner of common law contract claims, ranging from simple breaches to issues such as fraud, unconscionability, or the ultra vires doctrine, some of which could, if proven, result in an agreement being rendered void.  See, e.g., Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. at

---

[9] "A contract for information technology services shall not be considered a privatization contract if an employee organization recognized under [G. L. c. ] 150E, as the exclusive representative of an affected employee . . . agrees to the terms of the contract in writing.  An agreement solely to provide legal, management consulting, planning, engineering or design services shall not be considered a privatization contract." G. L. c. 7, § 53.

54 (contract void ab initio as ultra vires); Restatement 2d of Contracts, § 7, comment b (1981) (circumstances such as fraud or duress allow aggrieved party to void contract). Such challenges -- not based on the renewal agreements' noncompliance with Pacheco Law requirements -- may seek directly to set aside an exempt contract because it is, for example, beyond the department's authority and therefore ultra vires or the product of fraud.

Challenges also can seek indirectly the same result as to agreements ancillary to a void contract, because that contract is thereby rendered incapable of giving rise to any rights or duties. See 17A C.J.S. Contracts § 374 (2011) ("When parties to an illegal contract attempt to extend or renew it by entering into a new agreement, the new contract . . . is illegal and unenforceable"). Similarly, the latter type of challenge may affect "subsequent agreements" as the byproduct of a timely challenge to the validity of earlier contracts under the Pacheco Law, whether by virtue of the Auditor's objection pursuant to § 55, an action in the nature of certiorari challenging the Auditor's decision, or a declaratory judgment action challenging the agency's non-compliance with §§ 54 and 55. Nothing in the express language of § 53 shields exempt agreements from such claims.

The silence of § 53 as to whether exempt agreements are immunized from all claims must be viewed in light of the statutory scheme as a whole. See Pentucket Manor Chronic Hosp., Inc. v. Rate Setting Comm'n, 394 Mass. 233, 240 (1985) (statutes must be construed "as a harmonious whole"). Sections 54 and 55 plainly contemplate that privatization agreements, as defined in § 53, that are entered into absent compliance with the requirements set forth in those sections, will be deemed void. To imply that § 53 draws a cloak of immunity over renewal contracts made pursuant to a contract voided by virtue of §§ 54 and 55 would countermand the clear mandate of those sections, i.e., that agencies must comply with the Pacheco Law when entering into agreements to privatize services.

Nor does the legislative history support the view that the exemption of "subsequent agreements" from the definition of "privatization contracts" was intended to render such agreements wholly unreviewable. We look to legislative history because "statutes are to be interpreted, not alone according to their simple, literal, or strict verbal meaning" (citation omitted), Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court, 448 Mass. 15, 24 (2006), and "[u]nderstanding the intent of the Legislature" can be "far more important than a literal dictionary meaning." Quincy City Hosp. v. Rate Setting Comm'n, 406 Mass. 431, 449 (1990).

While the language of the exemption makes one purpose self-evident -- it prevents duplicative review of already-approved contracts -- the legislative history of the Pacheco Law suggests one further goal. The provision was a means of dealing with contracts that had already privatized state services prior to the effective date of the statute. It was added as an amendment to ensure that agreements continuing those contracts in place after the statute became effective were not to be upended by virtue of not having been or thereafter being in compliance with the statutory vetting process. See Anti-Privatization Bill Would Stall Weld Push, The Boston Globe, March 3, 1993 at 22 Senator Marc Pacheco, the bill's sponsor, explained that as to "private services that are out there right now . . . [their] renewal is exempt from the bill." State House News Serv. (June 16, 1993). On the other hand, nothing in the law's history suggests that the Legislature intended to protect the renewal of invalid contracts.

DMH contends, however, that the Legislature intended the statute to provide a safe harbor for subsequent agreements, including renewal contracts, in order to ensure finality and attendant certainty for the parties to the contracts and those they serve. On this view, § 53 functions as an implicit statute of repose. Challenges belatedly invalidating renewal contracts as the result of statutory noncompliance in connection with the

predecessor privatization contract would interfere with this salutary goal.  There is merit to this point, but it does not justify the immunity that DMH seeks for renewal contracts.  It goes instead to the timing of such challenges.

We are mindful that the statutory scheme recognizes the need for expedition in the review of privatization contracts. That is apparent in the short timelines set forth in § 55 for agency initiated review by the Auditor, and the fact that, if challenged thereafter in an action in the nature of certiorari, that action should be brought and adjudicated promptly.  Given this, we have indicated the need for similar dispatch in the one-off situations, as here, prompting declaratory judgment actions.  See SEIU I, 469 Mass. at 337 n.12.

Ordinarily, we would expect that a union challenging an agency's decision to forego Pacheco Law review for alleged privatization contracts would bring a declaratory judgment action promptly after the agency's decision becomes public information.[10]  Ascertaining whether the agency's assessment of the nature of the contract is correct, and therefore does not require Pacheco Law review, is the pivotal issue requiring

---

[10] Given the importance of speedy resolution, in many cases even limited delay might allow the defendant agency to raise the defense of laches.  See SEIU I, 469 Mass. at 337 n.12.  See also Mosley v. Briggs Realty Co., 320 Mass 278, 283 (1946) (laches requires delay and prejudice).

resolution.  Ideally, suit could be brought before the contract is made or as soon thereafter as feasible and, in most circumstances, well before any renewal or other subsequent agreements would be in place, with injunctive relief sought as appropriate.  The matter should be litigated and adjudicated on an expedited basis.

To the extent that suit cannot reasonably be brought until the contract is already in place, and in the presumably rare instances where the initial privatization contract is of such short duration that its renewal may take effect before the case is adjudicated, the result of a determination that the initial agreement is in fact a privatization agreement will be to declare such a contract invalid and thereby void and to set aside any renewal contracts made pursuant to it.  Timeliness issues for laches purposes are, of necessity, to be decided on a case-by-case basis, with the guiding principle being fairness; parties must not sit on their hands.  See, e.g., West Broadway Task Force v. Boston Hous. Auth., 414 Mass 394, 400 (1993) (laches operates where there is "unreasonable delay").

As discussed, the case before us is sui generis in this regard.  The union brought this suit in the absence of an express statutory remedy and after having made reasonable, if ultimately fruitless and time consuming, administrative efforts to challenge the initial contracts.  In the face of this

challenge to the validity of the agreements, the agency exercised its rights under them to renew.  In these unusual circumstances, it appears that the union did not sit on its hands.

To construe § 53 as barring the union from seeking to set aside the extant renewal contracts as the byproduct of a declaration as to the invalidity of the initial contracts would contravene the statutory mandate that noncompliance with its requirements has significant repercussions.  It would also, in these circumstances, render meaningless the timely challenge brought to the agency's decision not to submit the 2009 contract to the Auditor, in essence inoculating the agency from review and allowing it to evade the Pacheco Law with impunity by virtue of the passage of time.  As we stated in SEIU I, 469 Mass. at 336,

> "In short, it cannot be that there is no recourse where an agency, believing the Pacheco Law is inapplicable in a particular situation, simply opts not to comply with its terms.  The Pacheco Law could not function as the Legislature intended if an agency could decide, unilaterally and without input from the Auditor or the union, that its proposed contracts did not fall within the provisions of G. L. c. 7, § 53.  Indeed, a public agency would have little incentive to adhere to the Pacheco Law's requirements were its decision to evade those requirements immune from any review.  DMH's belief that the Pacheco Law does not apply to its proposed contracts cannot be understood to inoculate it against efforts to demonstrate otherwise.  Such an approach would render the statute toothless, confounding the Legislature's efforts to ensure that privatization does not occur at the expense of public welfare."

Here, as in SEIU I, DMH urges an interpretation of the Pacheco Law which would insulate potential privatization contracts from the very review that the law mandates. We do not believe the Legislature contemplated such a result.

3. Conclusion. The judgment dismissing the amended complaint is vacated, and the matter is remanded for further proceedings consistent with this opinion. Given the many delays that already have occurred, and the 2017 expiration of the extant renewal contracts, such further proceedings are to take place forthwith on an expedited basis.

So ordered.