# MASSACHUSETTS BAY TRANSPORTATION AUTHORITY *vs.* AUDITOR OF THE COMMONWEALTH.

Suffolk. December 7, 1999. - February 16, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Auditor. Privatization Act. Constitutional Law,* Standing. *Massachusetts Bay Transportation Authority,* Contract. *Practice, Civil,* Relief in the nature of certiorari, Standing. *Public Works,* Bidding procedure.

Discussion of the privatization law, G. L. c. 7, §§ 52-55. [785-786]

Discussion of the power of the Auditor of the Commonwealth granted by art. 17 of the Amendments to the Massachusetts Constitution and the privatization law, G. L. c. 7, §§ 52-55. [786-788]

The record of a proceeding in the nature of certiorari brought by the Massachusetts Bay Transportation Authority amply supported the objections of the Auditor of the Commonwealth to a certification, under the privatization law, G. L. c. 7, §§ 52-55, seeking to implement a proposed privatization contract: the Auditor did not err in the exercise of his power under the statute. [791-792]

The Massachusetts Bay Transportation Authority did not have standing to raise a constitutional challenge to the privatization law, G. L. c. 7, §§ 52-55. [792-793]

CIVIL ACTION commenced in the Superior Court Department on December 19, 1996.

The case was heard by *Margaret R. Hinkle,* J., on motions for summary judgment and judgment on the pleadings.

The Supreme Judicial Court granted an application for direct appellate review.

*H. Reed Witherby* for the plaintiff.

*Judith S. Yogman,* Assistant Attorney General, for the Auditor of the Commonwealth.

ABRAMS, J. The Massachusetts Bay Transportation Authority (MBTA) appeals from a decision by the Superior Court allowing the Auditor of the Commonwealth's (Auditor's) motion for judgment on the pleadings. See Mass. R. Civ. P. 56 (b) (1), 365 Mass. 824 (1974). On appeal, the MBTA argues that the Auditor's objections to a proposed contract between the MBTA

and a private corporation, Outdoor Systems, Inc. (Outdoor Systems), did not meet the procedural and substantive standards of G. L. c. 7, §§ 54 and 55. The MBTA also argues that G. L. c. 7, § 55 (*a*), is unconstitutional. We conclude the judge did not err in allowing the Auditor's motion for judgment on the pleadings. We also conclude that the MBTA does not have standing to challenge the constitutionality of a State statute and, thus, we do not address the constitutional claim.

1. *Facts*. The pleadings reveal the following facts. In an effort to raise revenue, the MBTA decided to hire a contractor to install advertising on MBTA bus shelters. Through research, the MBTA learned that such contractors generally require that they also have responsibility for cleaning and maintaining the bus shelters. The MBTA had assigned this cleaning and maintenance work to some of its own employees. On December 19, 1995, the MBTA issued an invitation for bids (IFB). The IFB provided that the chosen contractor would have advertising rights on 198 specified bus shelters. It also provided that the chosen contractor would clean, repair, and replace existing shelters and install new ones.

Because the contract would shift work that was done by MBTA employees to a private contractor, the contract was required to comply with the privatization law, G. L. c. 7, §§ 52-55.[1] The MBTA chose Gannett Systems, Outdoor Systems' predecessor-in-interest, as the contractor. As required by the privatization law, see G. L. c. 7, § 55, the MBTA presented the proposed contract to the Auditor on July 19, 1996. The Auditor objected to this contract on August 15.

Although the MBTA contended that the Auditor's objection was incorrect, it presented a second contract to the Auditor on November 12. Outdoor Systems was named as the proposed contractor and Robinson & Robinson was named as Outdoor Systems' proposed subcontractor for cleaning and maintenance. The Auditor rejected this proposed contract in a letter dated December 11, stating two objections.

First, the Auditor stated that the MBTA did not meet the requirements of G. L. c. 7, § 54 (7) (iii), because it did not "certify and demonstrate that the proposed contract cost will be less than the estimated cost of keeping the service in-house." The Auditor expressed this concern because the MBTA and the

---

[1]See part 2, *infra*.

proposed contractor each used a different number of shelters to calculate their cost estimates. Because the MBTA had not reconciled this variance before the end of the period the Auditor had to review the proposed contract, the Auditor stated that "[t]his flaw in the [IFB] calls into question the validity and reliability of the MBTA's procurement process regarding this proposal."

The Auditor's second objection was that the MBTA failed to fulfil the requirements of G. L. c. 7, § 54 (7) (iv), because "the agency [did not] certify and demonstrate that the designated bidder and its supervisory employees have historically complied with the relevant federal or state statutes." This objection was based on the failure of the MBTA to provide certificates of good standing from the State and Federal tax collection agencies for the proposed subcontractor, Robinson & Robinson.

On December 19, the MBTA filed a complaint seeking judicial review of the Auditor's objections.[2] The complaint also objected to the privatization law on constitutional grounds.[3] The MBTA moved for judgment on the pleadings and for summary judgment. The Auditor moved for judgment on the pleadings. In allowing the Auditor's motion for judgment on the pleadings, the court affirmed the Auditor's objections and "decline[d] to address the constitutional . . . issues." We granted the MBTA's application for direct appellate review.

2. *Statutory framework.* We begin by setting forth background information concerning the privatization law. The General Court stated that "[t]o ensure that citizens of the commonwealth receive high quality public services at low cost, with due regard for the taxpayers of the commonwealth and the needs of public and private workers, [it found] it necessary to regulate such privatization contracts in accordance with sections fifty-three to fifty-five, inclusive." G. L. c. 7, § 52.

Section 53 defines "privatization contract" as "an agreement or combination or series of agreements by which a nongovernmental person or entity agrees with an agency to provide services, valued at one hundred thousand dollars or more, which

---

[2]Outdoor Systems, Inc. (Outdoor Systems), joined in the complaint shortly after it was filed but is not a party to this appeal.

[3]The complaint also sought declaratory relief regarding the legal status of the Auditor's Guidelines for Implementing the Commonwealth's Privatization Law (March 1994). The resolution of this request for declaratory relief is not the subject of this appeal.

are substantially similar to and in lieu of, services theretofore provided, in whole or in part, by regular employees of an agency." G. L. c. 7, § 53.

Procedures that agencies must follow when beginning the bidding process for and entering into a privatization contract are set forth in G. L. c. 7, § 54. The statute requires the head of the agency to provide written certification to the Auditor that "(iii) the contract cost . . . will be less than the estimated cost [without privatization] . . . [and] (iv) the designated bidder and its supervisory employees, while in the employ of said designated bidder, have no adjudicated record of substantial or repeated willful noncompliance with any relevant federal or state regulatory statute." G. L. c. 7, § 54 (7) (iii) & (iv).

Section 55 requires the Auditor to review proposed privatization contracts. Specifically, it states that the proposed contract will not be valid if the Auditor objects within thirty days of receiving the certification required by § 54 (7). The objection "shall be in writing and shall state specifically the state Auditor's finding that the agency has failed to comply with one or more requirements of said [§ 54], including that the state Auditor finds incorrect, based on independent review of all the relevant facts, any of the findings required by paragraph (7) of said [§ 54]." G. L. c. 7, § 55 (*a*). Section 55 also authorizes the Auditor to "adopt regulations and prescribe forms to carry out the provisions of [sections 54 and 55]." G. L. c. 7, § 55 (*c*). Finally, it provides that "[t]he objection of the state Auditor . . . shall be final and binding on the agency, unless the state Auditor thereafter in writing withdraws the objection, stating the specific reasons, based upon a revised certificate by the agency . . . and upon the Auditor's review thereof." G. L. c. 7, § 55 (*d*).

3. *The Auditor's powers.* The Auditor was not designated a constitutional officer when the Massachusetts Constitution was adopted in 1780. However, during the debates of the constitutional convention of 1853, the drafters indicated that it was important to recognize the Auditor as a constitutional officer rather than allowing these duties to be completed by a committee of the Legislature or by any other officer. Official Report of the Debates and Proceedings on the State Convention 703 (1853). The drafters also noted the desirability of allowing the people to elect the Auditor, rather than permitting another official to appoint the Auditor, because our theory of government

places "the supreme power . . . with the people." *Id.* at 704. Thus, the Auditor became a constitutional officer in the executive branch, elected by popular vote, after the Constitution was amended in 1855.[4] See art. 17 of the Amendments to the Massachusetts Constitution.

The amendment elevated the office of the Auditor to true constitutional stature. See *Secretary of Admin. & Fin.* v. *Attorney Gen.*, 367 Mass. 154, 161 (1975). We have repeatedly confirmed the authority of constitutional officers to exercise independent judgment. See, e.g., *Alliance, AFSCME/SEIU, AFL-CIO* v. *Commonwealth*, 425 Mass. 534, 538 n.6 (1997) ("By virtue of this separate election, the Attorney General does not operate in a wholly subordinate role to the Governor, but may exercise independent judgment . . ."); *Secretary of Admin. & Fin.* v. *Attorney Gen., supra* at 163 (Attorney General may refuse to prosecute appeal, although requested to do so by Governor, where such appeal does not further public interest); *Sears* v. *Secretary of the Commonwealth*, 369 Mass. 392, 411-412 (1975) (State Secretary may use discretion in determining whether to accept late filed nomination papers).

In addition, the privatization law itself clearly grants power to the Auditor. The law and its history repeatedly reveal that the drafters of the privatization law were concerned that privatization was not always in the best interest of the public. See G. L. c. 7, § 52 (finding "that using private contractors to provide public services formerly provided by state employees does not always promote the public interest"); Senate Committee on Ways and Means, Fiscal Year 1994 Budget Recommendations 2-21 (June 1993) (concluding "some privatization has indeed come at the citizens' expense").

In response to this concern, the drafters crafted the privatization law to enable an elected official to review proposed privatization contracts. An early version of the bill charged the secretary of administration and finance, an official appointed by the Governor, with reviewing proposed privatization contracts. 1992 Senate Doc. No. 1257. However, the bill as ultimately enacted charged the Auditor, an elected official, with reviewing

---

[4]The amendment also made the Secretary of the Commonwealth, Treasurer and Receiver General, and the Attorney General constitutional officers and provided that they be elected by popular vote. Article 17 of the Amendments to the Massachusetts Constitution. See *Secretary of Admin. & Fin.* v. *Attorney Gen.*, 367 Mass. 154, 161 (1975).

proposed privatization contracts. G. L. c. 7, § 55. This shift of responsibility from an appointed official to an elected official indicates the Legislature's concern for public accountability. The law as passed ensures that the official who conducts the review is an elected official, and therefore accountable to the public.

The letter in which the Governor expressed his reasons for returning the bill unsigned also supports the view that the bill was intended to grant significant power to the Auditor.[5] In this letter, the Governor wrote "[i]n essence, in the bill the Legislature grants the State Auditor the discretionary power." Letter to the Massachusetts Senate from Governor William F. Weld, December 10, 1993.

4. *The MBTA's statutory challenges.* a. *Alleged procedural errors.* The MBTA first claims that the Auditor erred procedurally because he did not make a finding of incorrectness in support of either of his objections, as required by G. L. c. 7, § 55 (*a*). With respect to the Auditor's first objection, the MBTA argues that the Auditor should have used the subpoena power granted by G. L. c. 7, § 55 (*b*), to develop any relevant facts that would support a finding of incorrectness. Instead, the MBTA contends, the Auditor improperly imposed a burden of persuasion on the MBTA to demonstrate that the certifications it submitted were correct.

The MBTA argues that the Auditor's second objection, that the MBTA had not submitted sufficient credible evidence of the contractor's compliance with certain regulatory statutes, did not rise to the standard of a finding of incorrectness as statutorily required. The MBTA contends that a "conclusory generality of uncertainty" is not the equivalent of a finding of incorrectness.

b. *Alleged substantive errors.* The MBTA also raises allegations of two substantive errors. The MBTA first contends that the Auditor made several legal errors when he concluded that the MBTA did not satisfy G. L. c. 7, § 54 (7) (iii). The MBTA argues that the Auditor did not correctly compare the cost of entering into the contract to the in-house cost because it failed to complete this analysis using the designated bid, as required by G. L. c. 7, § 54 (6).

---

[5]We "turn to unofficial sources in order to gain a 'contemporary understanding' of the underlying purposes' of the legislation." *Rosse* v. *Commissioner of Revenue, ante* 431, 438 n.6 (1999), quoting *Kartell* v. *Blue Shield of Mass., Inc.,* 384 Mass. 409, 421 (1981).

According to the MBTA, the designated bid provided that the MBTA would receive $2.1 million in revenue. The minimum possible in-house cost would be $100,000.[6] Using this data, the MBTA argues, the proposed contract would result in significant cost savings for the MBTA. Based on this analysis, the MBTA contends, the Auditor could have concluded that the contract would not save costs only by ignoring the revenues from the proposed contract, in violation of G. L. c. 7, § 54 (6), and in violation of the Auditor's own Guidelines for Implementing the Privatization Law, §§ 4(A) and 4(C)(4) (March 1994).

Alternatively, the MBTA argues that, assuming arguendo the Auditor had a valid reason to ignore the $2.1 million revenue figure, the Auditor still erred under § 54 (7) (iii). Ignoring the revenue, the MBTA contends that the Auditor should have found the contract cost to be zero. Again, the lowest possible in-house cost would be $100,000. See note 6, *supra.* When these costs are compared, the MBTA concludes, the contract represented a significant cost savings for the MBTA.

The MBTA contends that the Auditor imputed a cost of cleaning and maintaining the bus shelters to Outdoor Systems rather than basing the projected contract cost on the designated bid. The MBTA next contends that the Auditor used this imputed cost as a point of comparison, rather than the cost from the designated bid. The MBTA alleges that the Auditor imputed a cost because he assumed that Outdoor Systems would have paid more if it were not required to clean and maintain the bus shelters. The MBTA argues that the use of the imputed cost is legal error. It also argues that the assumption behind the imputed cost was unsupported by the record. Further, the MBTA states that, in making this assumption, the Auditor wrongly second guessed the MBTA's determination of the scope of the procurement.

The MBTA's second substantive complaint is that the Auditor wrongly concluded that the proposed contract did not satisfy G. L. c. 7, § 54 (7) (iv). The Auditor objected under § 54 (7) (iv) because of the MBTA's failure to provide certification of good standing from State and Federal tax collection agencies for the proposed contractor. The MBTA contends that § 54 (7) (iv) only requires a designated bidder to comply with statutes "that regulate the conduct of a business enterprise." The MBTA

[6]The MBTA chose this cost because it is the lowest in-house cost that triggers the privatization law. See G. L. c. 7, § 53.

argues that tax laws are outside this realm. Thus, the MBTA concludes, it was legal error for the Auditor to base his objection "in the tax laws."

In addition, the MBTA argues that the Auditor required a greater showing than enunciated in § 54 (7) (iv). Specifically, the MBTA objects to the Auditor's request that the proposed subcontractor produce a certificate of good standing when the statute states that the proposed subcontractor "have no adjudicated record of substantial or repeated willful noncompliance with any relevant federal or state regulatory statute." G. L. c. 7, § 54 (7) (iv). The MBTA contends that the Auditor has set a higher hurdle than intended by the specific language of the statute.

Finally, the MBTA argues that, assuming arguendo the statute required compliance with tax laws, the record was sufficient to demonstrate compliance. The MBTA states that the proposed subcontractor provided written confirmation that it "does not have an adjudicated record of repeated non-compliance of [*sic*] any laws or regulations" and that it "is in compliance with, to the best of our knowledge[,] all federal and state regulations." The MBTA notes that this written documentation is contained in the record. Further, the MBTA states that the proposed subcontractor requested a letter of compliance from the Massachusetts Department of Revenue. The MBTA argues that this request supports the credibility of the proposed subcontractor's written confirmation. The proposed subcontractor did not receive a response prior to the Auditor's objection. The MBTA also contends that there is no evidence in the record to support a claim that the subcontractor was not in compliance with the tax laws.

c. *Standard of review.* The MBTA sought review of its statutory claims under G. L. c. 249, § 4, which provides for review in the nature of certiorari for proceedings not otherwise reviewable. In an action in the nature of certiorari brought under G. L. c. 249, § 4, "[a] court will correct only a substantial error of law, evidenced by the record, which adversely affects a material right of the plaintiff. . . . In its review, the court may rectify only those errors of law which have resulted in manifest injustice to the plaintiff or which have adversely affected the real interests of the general public" (internal quotations and citations omitted). *Carney* v. *Springfield*, 403 Mass. 604, 605 (1988). See *Gloucester* v. *Civil Service Comm'n*, 408 Mass.

292, 297 (1990), and cases cited; *Commissioner of Revenue* v. *Lawrence*, 379 Mass. 205, 208 (1979), and cases cited. Therefore, the question is whether, on the basis of the record before us, the Auditor substantially erred in a way that materially affected the rights of the parties.

d. *Discussion.* The MBTA asks us to rule that the powers of the Auditor are very limited. We do not agree. An office created by the Constitution can neither be abolished by statute nor reduced in duties by legislation. The Legislature, however, may grant additional powers to a constitutional office by statute. See, e.g., *Williams* v. *State Legislature of Idaho*, 111 Idaho 156, 160 (1986). See also *Murphy* v. *Yates*, 276 Md. 475, 491 (1975); *Allor* v. *Auditors of Wayne County*, 43 Mich. 76 (1880); *People ex rel. Bolton* v. *Albertson*, 55 N.Y. 50 (1873). This legislation gives the Auditor new statutory powers.[7]

As discussed, *supra*, the drafters at the constitutional convention of 1853 expressly conveyed their intent that the Auditor be a constitutional officer elected by the public. We have confirmed the desirability of constitutional officers to exercise independent judgment. Further, the Auditor, under the privatization law, operates under a broad grant of power. The legislative history of the privatization law and the law itself express the Legislature's intent that the Auditor exercise discretion in reviewing the contract.

General Laws c. 249, § 4, is available only to correct "substantial errors of law apparent on the record and which adversely affect material rights." *Murray* v. *Second Dist. Court of E. Middlesex*, 389 Mass. 508, 511 (1983), quoting *Commissioner of Revenue* v. *Lawrence, supra,* and *Commissioner of Civil Serv.* v. *Municipal Court of the City of Boston*, 369 Mass. 84, 90 (1975). We conclude that the record amply supports the Auditor. There was ample evidence that the MBTA did not clearly establish that its "in-house" and "contract" cost estimates were based on the same number of bus shelters. Further, Outdoor Systems did not clearly establish that it was in "good standing" with relevant State and Federal taxing authorities. The Auditor's objections, therefore, were reasonable and followed the statutory mandate that he independently review the contract. We conclude that the Auditor did not err in the exercise

---

[7]The cases cited by the MBTA, which describe the Auditor's duties, reflect his constitutional powers. Here, we are concerned with the Auditor's statutory powers.

of his power under the statute. The judge correctly granted the Auditor's motion for judgment on the pleadings.

5. *The MBTA's constitutional challenge.* The MBTA also argues that G. L. c. 7, § 55 (*a*), is unconstitutional. The MBTA argues that the statute confers power on the Auditor "to overrule the judgments of the Governor's representatives in the exercise of their executive functions" in violation of Part II, c. 2, § 1, art. 1,[8] of the Massachusetts Constitution and art. 30 of the Declaration of Rights.[9]

As a threshold matter, we must consider whether the MBTA has standing to challenge a State law on constitutional grounds. The MBTA argues that the doctrine we articulated in *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 610 (1983), should be construed narrowly and that the MBTA has standing under *LaGrant* v. *Boston Hous. Auth.*, 403 Mass. 328, 330 (1988).

We conclude that the MBTA does not have standing to raise this claim. In *Spence*, we recognized a "long-standing and far-reaching prohibition on constitutional challenges by governmental entities to acts of their creator State." *Spence* v. *Boston Edison Co.*, *supra.* We have since applied the *Spence* doctrine in a wide range of cases. See, e.g., *Clean Harbors of Braintree, Inc.* v. *Board of Health of Braintree*, 415 Mass. 876, 878 (1993) (board, municipal agency of town, cannot challenge constitutionality of State statute); *Brookline* v. *The Governor*, 407 Mass. 377, 386 (1990) (Liacos, C.J., concurring) (municipality cannot challenge constitutionality of State statute based on its enactment as an "outside section" of the general appropriation act); *Trustees of Worcester State Hosp.* v. *The Governor*, 395 Mass. 377, 380 (1985) (takings claim barred because governmental entities cannot challenge constitutionality of State statutes).

Further, *LaGrant* recognized a very fine distinction, thereby enabling an agency to challenge the constitutionality of a State statute. We distinguished a situation in which an agency raised

---

[8]Part II, c. 2, § 1, art. 1, of the Massachusetts Constitution provides: "There shall be a supreme executive Magistrate, who shall be stiled, THE GOVERNOR OF THE COMMONWEALTH OF MASSACHUSETTS; and whose title shall be — HIS EXCELLENCY."

[9]Article 30 of the Declaration of Rights provides: "In the government of this Commonwealth, the legislative department shall never exercise the executive and the judicial powers, or either of them: The executive shall never exercise the legislative and judicial powers, or either of them: The judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

the "claim that the Legislature has violated art. 30 by encroaching on the power of the judiciary." *LaGrant* v. *Boston Hous. Auth.*, *supra* at 330. This exception is inapplicable here because the Auditor and the Governor are both within the executive branch of government.

The MBTA also suggests that we permit it to raise this challenge because of our comment in *Brookline* v. *The Governor*, *supra* at 384 n.10, that "[w]e would be reluctant to tolerate a situation in which allegedly unconstitutional conduct would be free from judicial scrutiny even on the request of an entity most directly affected by the alleged unlawful conduct." The MBTA failed to note that we prefaced that statement with the following: "[i]f the plaintiff[s] [in this case] lack standing to challenge the [statute], no one else is likely to have any greater standing to do so." *Id.* Here, we are not convinced that no other plaintiff is likely to have standing, and we shall not make that assumption. "[A]n unfounded assumption that, if [the MBTA] lacks standing, no one will have standing to sue, is not a reason to find standing where none exists." *Tax Equity Alliance for Mass.* v. *Commissioner of Revenue*, 423 Mass. 708, 716 (1996).

The MBTA was created by statute. See G. L. c. 161A, § 2. "Agencies, which are creations of the State, may not challenge the constitutionality of State statutes." *Spence* v. *Boston Edison Co.*, *supra* at 610. Because we conclude that the MBTA does not have standing to challenge the constitutionality of a State statute, we do not address the MBTA's claim that G. L. c. 7, § 55 (*a*), is unconstitutional.

6. *Conclusion.* We conclude that the Auditor's objections were grounded in the record and well within his statutory powers. We also conclude that the MBTA does not have standing to challenge the constitutionality of a State statute and, thus, we do not address that claim.

*Judgment affirmed.*