NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12126

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 509, & others[1]  vs.
AUDITOR OF THE COMMONWEALTH & others.[2]


Suffolk.     September 6, 2016. - December 9, 2016.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.


Privatization Act.  Auditor.  Commissioner of Mental Health.
    Public Welfare, Department of Health and Human Services.
    Mental Health.  Practice, Civil, Action in nature of
    certiorari.



    Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on April 8, 2016.

    The case was reported by Spina, J.


    Ian O. Russell (Katherine D. Shea & James F. Lemond with
him) for the plaintiffs.
    Bryan F. Bertram, Assistant Attorney General (Daniel J.
Hammond, Assistant Attorney General, with him) for the
defendants.

---

[1] Massachusetts Nurses Association, and American Federation
of State, County and Municipal Employees Council 93.

[2] Department of Mental Health, and Executive Office of
Health and Human Services (EOHHS).

LENK, J.  The plaintiffs, Service Employees International Union, Local 509 (SEIU), the Massachusetts Nurses Association, and the American Federation of State, County and Municipal Employees, Council 93, challenge a decision by the Auditor of the Commonwealth approving a proposed privatization contract pursuant to G. L. c. 7, §§ 52-55 (Pacheco Law).  The Pacheco Law establishes "[p]rocedures that agencies must follow when beginning the bidding process for and entering into a privatization contract."  Massachusetts Bay Transp. Auth. v. Auditor of the Commonwealth, 430 Mass. 783, 786 (2000) (MBTA).  The Auditor of the Commonwealth must review all privatization proposals to determine if they comply with the Pacheco Law.  Id.

In January, 2016, the Department of Mental Health (DMH) submitted a proposal to the Auditor that would privatize certain of its State-run mental health services.  Under the terms of the proposal, the Massachusetts Behavioral Health Partnership (MBHP), a privately owned State-wide mental health provider, would take over from DMH the provision of mental health services in the Southeast region of Massachusetts.  In March, 2016, the Auditor issued a written decision concluding that DMH's privatization proposal met the requirements of the Pacheco Law, specifically, that the privatization was procured properly, that it would not result in a net cost to the Commonwealth, and that it would not cause a decline in the quality of mental health

services provided in the Southeast region.  The plaintiffs then filed a petition in the nature of certiorari in the county court, seeking review of the Auditor's decision.  A single justice reserved and reported the matter to the full court.

We conclude that the Auditor did not abuse her discretion in determining that DMH's privatization proposal met the requirements of the Pacheco Law.  Accordingly, we affirm the Auditor's decision.

1.  Background.  DMH administers mental health services to low and moderate income residents of the Commonwealth through the "MassHealth" program.[3]  The provision of these services is divided into five geographic regions within the Commonwealth, each containing several emergency service programs (ESPs): Metro Boston, Western Massachusetts, Central Massachusetts, Southeast and Northeast-Suburban.[4]  In each region, the ESPs provide twenty-four hour emergency mental health services to MassHealth members, uninsured individuals, and others requiring mental health crisis intervention.  Prior to the effective date of the Pacheco Law in 1993, DMH contracted with private

---

[3] DMH is an agency within EOHHS.  For clarity, we will refer to DMH as the contracting party throughout the opinion, even though EOHHS simultaneously played a role in the contracting process.

[4] The Southeast region encompasses Brockton, Cape Cod and the Islands, Fall River, and Taunton/Attleboro.

contractors to provide ESP services throughout Massachusetts,[5] with the exception of the Southeast region.[6]

DMH entered into the most recent contract concerning the provision of ESP services on July 1, 2012. After a competitive procurement process, DMH awarded a five-year contract[7] to MBHP to manage all of the ESPs in the Commonwealth except those in the Southeast region.[8] It is undisputed that the 2012 contract was not subject to the requirements of the Pacheco Law because the services awarded to MBHP were already privately operated.

---

[5] Mental Health Management of America, a private company, apparently began to provide mental health services to mentally ill patients covered by Medicaid in 1992. See Weld to Privatize Acute Care for Uninsured Mentally Ill, Boston Globe, Jan. 25, 1995, at 1 ("Since 1992, Mental Health Management of America . . . has been responsible for providing acute care to mentally ill patients on Medicaid"); The Massachusetts Behavioral Health Partnership (MBHP) took over the provision of such services from Mental Health Management of America in 1996. See State Chooses New Firm to Provide Managed Care For Mentally Ill, Boston Herald, Jan. 20, 1996, at 6 ("[MBHP] will provide mental health and substance abuse services to 400,000 Medicaid clients as well as 30,000 residents who are covered directly by [DMH]").

[6] During that period, DMH provided emergency service program (ESP) services in the Southeast region directly through its own employees.

[7] The contract required MBHP to procure contracts with ESP providers to deliver "direct care for behavioral-health crises and emergency services to subscribers to ['MassHealth'], subscribers to private health insurers, or the uninsured."

[8] In procuring the 2012 contract, DMH issued a blanket request for responses (RFR) seeking a vendor to provide various medical services in accordance with the provisions of 801 Code Mass. Regs. §§ 21.00 (2003) and 801 Code Mass. Regs. § 21.06 (1997), which mandate a competitive procurement process for agency contracts.

Under the terms of the contract, DMH reserved the right to amend it "to implement new initiatives or to modify initiatives."

In 2015, DMH amended its 2012 contract with MBHP in an effort to privatize ESP services in the Southeast region. Pursuant to the terms of the amended contract (2015 amendment), MBHP would take over management of the remaining State-run ESP services in that region. Toward that end, MBHP was required to "contract with one locally based provider to administer the ESP for each catchment area,"[9] issue a "request for responses (RFR)" to procure ESP services for the Southeast region and "select winning bidders" to provide services in accordance with a set of guidelines established by DMH. DMH created the criteria for selection of the winning bids and retained final approval authority over the selection of the winning bidders. After seeking interested bidders, MBHP ultimately recommended two organizations to provide ESP services in the Southeast region.

In accordance with its obligations under the Pacheco Law, in January, 2016, DMH provided written notice and certification to the Auditor of its privatization proposal and a comprehensive analysis of how the proposal comported with the Pacheco Law.[10]

---

[9] A "catchment area" is a geographical term used by DMH to divide the Commonwealth into different divisions.

[10] The Pacheco Law requires that any agency that wishes to enter into a privatization contract must, "in consultation with the executive office for administration and finance, first

The submission included a detailed analysis of the financial benefits of privatization,[11] the structure of services that the private ESP providers would deliver, and a model contract between MBHP and each private ESP provider in the Southeast region.[12]  Shortly thereafter, SEIU submitted a series of objections to the Auditor, pursuant to provisions in the Pacheco Law, challenging a number of aspects of the privatization proposal.

On March 30, 2016, the Auditor issued her "Independent State Auditor's Determination on the Department of Mental Health's Proposal to Privatize Its Southeast Emergency Services Program," approving the privatization proposal.  Shortly after

compl[y] with" several requirements.  G. L. c. 7, § 54.  The agency head must certify in writing to the Auditor that the agency solicited "competitive sealed bids for the privatization contracts," G. L. c. 7, § 54 (1); that the privatization contract provides a guaranteed minimum wage rate set out in the statute and the same health insurance benefits for each previously public position as was provided by the State, G. L. c. 7, § 54 (2); that the privatization contract results in net savings compared to "the costs of regular agency employees[] providing the subject services in the most cost-efficient manner," G. L. c. 7, § 54 (4); and that the "quality of services to be provided" will "equal or exceed the quality of services which could be provided by regular agency employees," G. L. c. 7, § 54 (7) (ii).

[11] DMH's submission noted that privatization would save the Commonwealth $7,007,864 in its first year, and would provide similar savings in subsequent years.

[12] The sample contract between MBHP and each ESP provider included a list of metrics by which MBHP would measure the performance of each provider, and noted that the contract would be in effect until June 30, 2017.

the decision was issued, the plaintiffs filed a petition in the nature of certiorari, G. L. c. 249, § 4, in the county court. The parties then jointly asked the single justice to reserve and report the case to the full court. The single justice did so.[13]

The plaintiffs maintain that the Auditor's decision was arbitrary and capricious because DMH failed to seek competitive bids before entering into the 2015 amendment with MBHP; DMH improperly delegated the solicitation process of ESP providers to MBHP; the privatization proposal fails to uphold the minimum wage and benefits protections of the Pacheco Law; the Auditor failed to take into account the costs of "bumping" and seniority rights; and the quality of services provided by MBHP would be lower than those currently provided by DMH.

2. Discussion. a. Standard of review. In the absence of a statutory right of appeal, the plaintiffs sought review of the Auditor's decision by requesting relief in the nature of certiorari, G. L. c. 249, § 4. "The function of a civil action in the nature of certiorari . . . is 'to relieve aggrieved parties from the injustice arising from errors of law committed in proceedings affecting their justiciable rights when no other means of relief are open.'" Figgs v. Boston Housing Auth., 469

---

[13] The defendants' attorney represented during argument before us that DMH has not proceeded with implementation of the 2015 amendment pending the outcome of this litigation.

Mass. 354, 361 (2014), quoting Swan v. Justices of the Superior Court, 222 Mass. 542, 544 (1916).

An action in the nature of certiorari is an appropriate means by which to challenge the Auditor's determination whether a privatization contract complies with the Pacheco Law. See MBTA, 430 Mass. at 790-791. "The legislative history of the [Pacheco Law] and the law itself express the Legislature's intent that the Auditor exercise discretion in reviewing the contract." Id. at 791. In considering a discretionary decision by an administrative agency, as here, "a reviewing court . . . is limited to determining whether the decision is legally erroneous or so devoid of factual support as to be arbitrary and capricious." MacLaurin v. Holyoke, 475 Mass. 231, 238 (2016).[14] In conducting our review, we are mindful that "[a] decision is . . . arbitrary and capricious [where] there is no ground which 'reasonable [persons] might deem proper' to support it." Garrity v. Conservation Comm'n of Hingham, 462 Mass. 779, 792 (2012), quoting T.D.J. Dev. Corp. v. Conservation Comm'n of N. Andover, 36 Mass. App. Ct. 124, 128 (1994).

b. Procurement process. We first address the plaintiffs' argument that, in contravention of the Pacheco Law, DMH did not

_____

[14] The plaintiffs' counsel acknowledged at argument before us that the arbitrary and capricious standard of review was applicable.

publicly procure the services covered by the 2015 amendment.[15]

The 2015 amendment, inter alia, transferred managerial

responsibilities concerning the Southeast region ESPs from DMH

to MBHP and tasked MBHP with procuring private vendors to run

the ESPs.  The Auditor's analysis of the privatization

proposal's compliance with the procurement requirements of the

Pacheco Law began with the unremarkable determination that the

privatization contract at issue here constituted a "series or

combination of agreements."[16]  She then determined that "[i]n a

more complicated privatization proposal such as this, it is

essential that all the agreements are subject to a public

procurement process . . . ."  The Auditor went on to construe

the Pacheco Law as requiring that only "[t]he essential

contracts in a series of contracts" must be competitively

procured "at the time of the privatization."  "[E]ssential

contracts" are, in this regard, "the contracts that govern the

provision of public services formerly provided by [S]tate

---

[15] Here, the plaintiffs object to the procurement process as provided by the Pacheco Law, not as set forth in the regulations established in 801 Code Mass. Regs. § 21:06.  Although the plaintiffs earlier made an objection to the Auditor that the procurement process in this case did not comport with State procurement regulations, before us the plaintiffs explicitly disclaim that objection.

[16] Insofar as the language of the statute defines a "[p]rivatization contract" as "an agreement or combination or series of agreements," G. L. c. 7, § 53, this determination is patently reasonable.  The plaintiffs do not contend otherwise.

employees."  Additionally, the Auditor noted that the 2015 amendment was "part" of the 2012 contract, which had been publicly procured by competitive bidding at its inception,[17] because the additional obligations that the amendment placed upon MBHP were explicitly contemplated in the language of that contract.

The Auditor then concluded that the agreements between MBHP and the ESP providers were the only "essential contracts" in the series or combination of agreements constituting the proposed privatization contract.  Only those contracts had to be procured under the Pacheco Law at the time of the privatization.  Because MBHP had in fact solicited competitive bids for the ESP contracts pursuant to its obligations under the 2012 contract as amended in 2015, the Auditor concluded that the proposed privatization contract had met the procurement requirements of the Pacheco Law.

The plaintiffs contend that the Auditor erred in several respects.  They chiefly object to her determination that the 2015 amendment did not constitute an "essential agreement" in the privatization contract, contending that it was the vehicle that set in motion the proposed privatization.  Accordingly, they argue that DMH was obligated to publicly procure the

---

[17] The 2012 contract had been subject to a competitive procurement process under State procurement regulations.  See 801 Code Mass. Regs. § 21:06.

services covered by the amendment.[18]  The plaintiffs do not assert that either the 2012 contract or MBHP's contracts with ESP providers failed to satisfy the public procurement requirements of the Pacheco Law.  We address each of the Auditor's conclusions in turn.

The Auditor's determination that only the "essential" agreements in a privatization contract, the agreements which "govern the provision of public services formerly provided by

---

[18] While both the Pacheco Law and state procurement regulations set forth in 801 Code Mass. Regs. §§ 21:00 require that public agencies solicit competitive bids with reference to the procurement of services, the Pacheco Law places several additional requirements on agencies asking to privatize services.  See 801 Code Mass. Regs. § 21:06 ("All acquisitions of Commodities or Services, or both, must be competitively procured unless the acquisition qualifies as an exception under [801 Code Mass. Regs. § 21:05]"); G. L. c. 7, § 54 (1) ("The [privatizing] agency shall solicit competitive sealed bids for the privatization contracts based upon [a written statement of the services to be privatized]").  For example, the Pacheco Law provides that "[n]o amendment to a privatization contract shall be valid if it has the purpose or effect of avoiding any requirement of this section."  Id.

Additionally, the Pacheco Law does not contain the broad list of exempt institutions that are in the procurement regulations.  See 801 Code Mass. Regs. § 21:01 (2) (2003) (exempting institutions of higher learning, elected offices, military division, and independent public authorities).  The differences between the State regulations and the procurement requirements of the Pacheco Law are not without consequence. For example, in 2015, the Auditor rejected a privatization proposal from Roxbury Community College on the basis that although it was exempt from State procurement regulations, it was still bound by and had not complied with the procurement requirements of the Pacheco Law.  See Letter dated Nov. 17, 2015, at http://www.mass.gov/auditor/docs/privatization/11-17-15-signed-objection-letter-for-roxbury-community-college.pdf [https://perma.cc/NB9Q-T88A].

[S]tate employees," must be procured publicly by competitive bidding "at the time of the privatization" is itself reasonable. See Dowling v. Registrar of Motor Vehicles, 425 Mass. 523, 525 (1997), quoting Massachusetts Med. Soc'y v. Commissioner of Ins., 402 Mass. 44, 62 (1988) ("Where the [agency's] statutory interpretation is reasonable . . . the court should not supplant [its] judgment").  The statutory language does not speak directly to whether all or only some parts of a privatization contract consisting of a series or combination of agreements must be competitively procured.  The Pacheco Law defines a privatization contract, however, as a contract by which a private entity "agrees with an agency to provide services . . . which are substantially similar to and in lieu of, services theretofore provided, in whole or in part, by regular employees of an agency."  G. L. c. 7, § 53.  The Auditor's judgment that the "essential contracts" are those which actually include the private providers taking over public services directly aligns with this definition.

The Auditor's challenged determination that the 2015 amendment does not constitute an "essential agreement" in the privatization contract that must be publicly procured at the time of the privatization presents a somewhat closer question. Her conclusion rests on two grounds.  First, she determined that the 2015 amendment was part of the 2012 contract, which already

had been publicly procured.  Second, she found that the only contracts that actually "govern the provision of public services formerly provided by [S]tate employees" are the contracts between MBHP and the ESP providers.  Hence, in her view, the 2015 amendment did not constitute an "essential" agreement because it was part of the 2012 contract and did not actually effectuate the privatization.

The disagreement between the plaintiffs and the Auditor boils down to whether the 2015 amendment "govern[s] the provision of public services formerly provided by [S]tate employees."  The Auditor's determination that the 2015 amendment, which provided for the expansion of MBHP's oversight and solicitation obligations, did not govern the provision of public services formerly provided by State workers is not an unreasonable resolution of that question.  The 2015 amendment merely extends MBHP's oversight of State ESP services under the 2012 contract and directs it to solicit the private providers that will take over the State positions.  Given that the Auditor advances a reasonable interpretation and application of the procurement requirements of the Pacheco Law, we cannot conclude that her interpretation, in these circumstances, was arbitrary and capricious.  See Massachusetts Med. Soc'y v. Commissioner of Ins., 402 Mass. at 62 ("Where [an

agency's] statutory interpretation is reasonable . . . the court should not supplant [its] judgment").[19]

c. Delegation by DMH. We next address the plaintiffs' argument that DMH improperly delegated to MBHP the procurement process for the privatization contract, in violation of the Pacheco Law. The 2015 amendment charged MBHP with issuing a "request for responses (RFR)" to procure ESP services for the Southeast region and "select[ing] winning bidders" to provide services in accordance with a set of guidelines established by DMH. The plaintiffs contend that DMH's assignment of these tasks to MBHP contravened the requirements of the Pacheco Law. The Pacheco Law provides, in relevant part, that an "agency" intending to enter into a privatization contract "shall solicit competitive sealed bids for the . . . contracts," and then "publicly designate the bidder to which it proposes to award the contract." G. L. c. 7, § 54 (1), (6). An "agency" is defined as "an executive office, department, division, board, commission, or other office or officer in the executive branch of the government of the [C]ommonwealth." G. L. c. 7, § 53. The plaintiffs contend that the definition of "agency" in the

_____

[19] The plaintiffs also argue that the amendment was invalid in any case because it "had the purpose or effect of avoiding" the procurement requirements of the Pacheco Law. See G. L. c. 7, § 54 (1). This argument is unavailing because, as the Auditor notes and the plaintiffs repeatedly state in their argument, the 2012 contract was not a privatization contract.

Pacheco Law unambiguously required that DMH itself solicit the bids and publicly designate the winning proposals in its privatization. By contrast, the Auditor, in approving DMH's delegation of certain solicitation-related tasks to MBHP, determined that it was "unreasonable to assume that the Legislature would only permit an agency to undertake [the tasks associated with the solicitation process] directly, even when indirectly undertaking those tasks" would best serve the purposes of the law as expressed in its preamble.

The Auditor's determination that, in these circumstances, DMH's assignment of certain tasks to MBHP did not violate the Pacheco Law is reasonable because DMH retained control over the solicitation process. Nothing in the statutory text of the Pacheco Law proscribes an agency from implementing the solicitation process through an intermediary acting under the agency's direction. Furthermore, doing so would not contravene the purpose of the Pacheco Law where, as the Auditor noted in her decision, the agency "indirectly undertaking those tasks . . . ensures that the Commonwealth receives high-quality public services at low cost with due regard for the taxpayers of the Commonwealth and the needs of public and private workers." See G. L. c. 7, § 52.

Here, there was ample evidence before the Auditor that DMH controlled the procedure, criteria, and outcome of the

solicitation process.  The 2015 amendment provided DMH with control over how MBHP conducted the solicitation process, the performance standards that bidders responding to the RFR would have to meet in order to qualify as an ESP provider, and final approval rights over the selection of the winning bidders. Accordingly, the Auditor's determination that DMH's delegation of solicitation-related tasks to MBHP did not run afoul of the Pacheco Law was not arbitrary and capricious.

d.  Minimum wage and benefit provisions.  We next turn to the plaintiffs' argument that the model contract between MBHP and the ESP providers included in the privatization proposal fails to require compliance with the minimum wage and benefit protections of the Pacheco Law beyond June 30, 2017.  Under the Pacheco Law, "[e]very bid for a privatization contract and every privatization contract shall include provisions specifically establishing the wage rate for each such position, which shall not be less than" "the lesser of step one of the grade or classification under which the comparable regular agency employee is paid, or the average private sector wage rate for said position."  G. L. c. 7, § 54 (2).  The statute also mandates that successful bidders provide health insurance benefits comparable to those previously provided by the Commonwealth to State employees performing the same services. Id.

The plaintiffs argue that the model contract improperly terminates these protections at the end of the current contract period, June 30, 2017. First, they contend that these protections cannot be terminated as long as the corresponding, previously State-employed jobs still exist. In the alternative, the plaintiffs maintain that the guarantee of the wage and health insurance protections for merely one year in the model contract constitutes an impermissible end run around the Pacheco Law.

In considering this issue, the Auditor found that the Pacheco Law "sets forth no minimum standard for the term of a privatization contract." She then determined that the test that she would use in "assessing the legitimacy of the term of a privatization contract is whether the contract's term has some rational basis or is designed to avoid the requirements of the [Pacheco Law]." Applying this standard to DMH's privatization proposal, she found that "the limited timeframe for the contract [and therefore for the protections] results from [DMH's] preference to provide all ESP services under one umbrella contract with MBHP, or whoever the successful bidder is at the expiration of the [2012 contract]."

The Auditor concluded that this was a "rational basis" for the short duration of the ESP contracts and the protections they provided. During the review period, DMH had written to the

Auditor that it intended to extend its then-current contract with MBHP and would extend these protections under that contract. As noted in the decision, the Auditor's approval of the privatization proposal was based in part on that representation.[20] We conclude that there was no abuse of discretion in the Auditor's reliance on DMH's written representation that it would comply with her interpretation of the Pacheco Law as a factor in her decision to approve the privatization proposal.[21]

e. Costs of "bumping" and seniority rights. The plaintiffs maintain that, while the Auditor discussed the subject of transition costs resulting from the termination of employees as a result of the proposed privatization, she failed

---

[20] The Auditor stated in her decision that "if the procurement of a successor agreement to the agreement between [DMH] and MBHP is not completed by the end of June 2017 and instead the present agreement is extended until a new contract is negotiated, the wage and benefit requirements of the [Pacheco Law] should continue to apply as well until that new contract is finalized." Elaborating on her view, she added that "[a]ny amendment at that time that would, in extending the length of the contract, also affect the wage and benefit protections of the [Pacheco Law] would be inconsistent with this view." Finally, she noted that "[i]n a communication with this office . . . DMH took the same position, and this office's decision not to object to the privatization proposal is based, in part, on this assurance."

[21] The Auditor did not address the contention that the protections provided by the Pacheco Law extend in perpetuity as long as the State jobs they correspond to exist. We, like the Auditor, do not reach the question of the length of time a private provider must continue to meet the minimum wage and benefits requirements of the Pacheco Law.

to account for the costs[22] stemming from "bumping" and seniority rights in determining that the privatization would provide the Commonwealth over-all cost savings.[23]

DMH provided the Auditor with a calculation of the potential transition costs incurred as a result of the privatization, based on the assumption that every DMH employee affected by the privatization accepted a layoff and received the maximum unemployment benefits to which the employee was entitled. The cost of this worst-case scenario was estimated to be approximately $2.2 million. Taking those transition costs into account, the Auditor determined that the reductions in cost from the proposed privatization of the Southeast region would result in savings of approximately $7 million over the first year of privatization.

The plaintiffs contend that, although the Auditor took notice of these cost data, she erred by not taking into account

---

[22] The Pacheco Law mandates that the cost of a privatization contract must "be less than the estimated cost" of the "costs of regular agency employees[] providing the subject services" "in the most cost-efficient manner." See G. L. c. 7, § 54 (4), (7) (iii).

[23] "Bumping" is a process by which employees with greater seniority whose jobs are being eliminated or who face being laid off may displace less senior employees. See, e.g., Andrews v. Civil Serv. Comm'n, 446 Mass. 611, 619 (2006); Boston v. Salaried Employees of N. Am., Local 5198, 77 Mass. App. Ct. 785, 786 (2010); Herlihy v. Civil Serv. Comm'n, 44 Mass. App. Ct. 835, 835 (1998). For example, a senior DMH employee whose position was terminated as part of the privatization could opt to take the comparable job of a less senior employee.

the specific costs of retraining transferred employees who moved into different jobs as a result of "bumping."  The plaintiffs have not, however, made a showing that those retraining costs could equal or outweigh the $7 million in savings that the Auditor found would stem from the privatization, nor do they otherwise contest the Auditor's conclusion concerning the reduction in costs the privatization would afford the Commonwealth.  Hence, even if the plaintiffs' contention that the Auditor did not take into account costs associated with "bumping" and seniority rights is correct, her conclusion that the privatization would provide savings to the Commonwealth in accordance with the requirements of the Pacheco Law would still be accurate.  We therefore discern no basis on which to conclude that her judgment on this issue was arbitrary and capricious.

f.  Quality of ESP services following privatization.  The plaintiffs' final objection concerns the Auditor's determination that there will be no reduction in the quality of services as a result of the proposed privatization.  The Pacheco Law requires an agency advancing a privatization proposal to demonstrate to the Auditor that "the quality of the services to be provided by the designated bidder is likely to . . . equal or exceed the quality of services which could be provided by regular agency employees," G. L. c. 7, § 54 (7) (ii), "providing the subject

services in the most cost-efficient manner," G. L. c. 7, § 54 (4).

We review the Auditor's conclusions as to the quality of services under the privatization proposal to determine if they rest on at least one "ground which reasonable [persons] might deem proper to support it" (quotation and citation omitted). See Garrity v. Conservation Comm'n of Hingham, 462 Mass. at 792. The plaintiffs argue that the Auditor erred in four respects in determining that the quality of services would not decline due to the proposed privatization. They contend that the proposed privatization will fail to provide services to patients with commercial health insurance; result in fewer licensed clinicians serving patients; lead to a harmful reduction in staffing in the Southeast region; and reduce the hours of staff availability at community centers in the ESPs. We address each of these contentions in turn.

The plaintiffs first maintain that, contrary to the Auditor's findings, the model contract contained in DMH's submission to the Auditor does not mandate that ESP providers deliver services to commercially insured individuals. The Auditor noted in her decision that the model contract explicitly requires that ESPs must provide services "to individuals . . . experiencing a behavioral health crisis," and that DMH represented to her that ESPs would be required to provide

service to all individuals, regardless of any insurance coverage. The Auditor's reliance on the model contract, as augmented by DMH's representation, was not unreasonable.

The plaintiffs also object that the Auditor's decision does not adequately address SEIU's arguments that the private ESP providers will employ more unlicensed clinicians than does DMH,[24] and that the proposed privatization will result in a significant reduction in staffing in the Southeast region. The plaintiffs contend that both of these occurrences will result in a decline in the quality of services in the Southeast region as a result of the privatization. The Auditor's determination addressed both of these contentions by stating that the model contract requires ESP providers to meet the same standards of care currently provided by DMH's State employees.[25] Given that the Auditor relied on the contractual obligations of the ESP

---

[24] According to the Service Employees International Union, Local 509 (SEIU), and undisputed by DMH, eighty-seven per cent of DMH clinicians providing ESP services have a professional license, while only sixty-eight per cent of ESP clinicians Statewide are licensed.

[25] In this regard, the Auditor had data before her that, although disputed by SEIU, she apparently credited. The data, submitted to the Auditor by DMH, based on studies by MBHP, purports to show that private ESP providers across the Commonwealth have provided equal or better care than the ESPs operated directly by DMH. The private ESPs which purportedly performed as well or better than their State counterparts were subject to similar licensing requirements as the private ESP providers in the Southeast region would be under the model contract.

providers in addressing plaintiffs' contentions, her judgment in this instance was reasonable.

Finally, the plaintiffs object to the proposal's reduction in walk-in services at community centers in the ESPs from the current twenty-four hour per day staffing levels.[26] The Auditor noted in her decision that the proposed ESP contract guarantees services to those in psychiatric distress twenty-four hours each day, seven days per week, regardless of the hours when the community-based location is staffed,[27] and that only 0.63 per cent of patient encounters in the Southeast region over the prior year took place at the community centers during a time when staff would not be present under the terms of the model contract. She determined that any impact on service would be "de minimis." This was not unreasonable.

We accordingly conclude that the Auditor's judgment that the quality of services would not decline as a result of the proposed privatization was reasonable. See Forsyth Sch. For Dental Hygienists v. Board of Registration in Dentistry, 404 Mass. 211, 218 (1989) ("[An agency's decision] can be disturbed

---

[26] Under the model contract, community-based locations in Brockton and Taunton would be open for walk-in services between 8 A.M. and 8 P.M., Monday through Friday, while the locations in Cape Cod and Fall River would be open between 7 A.M. and 11 P.M.

[27] DMH represented to the Auditor during the review process that ESPs would use mobile service centers to respond to patients in distress.

only if it is based on a legally untenable ground . . . or is unreasonable . . ." [quotations and citation omitted]).

3.  Conclusion.  The matter is remanded to the county court for entry of an order affirming the Auditor's determination that DMH's 2016 proposal to privatize its southeastern emergency service programs comports with the requirements of the Pacheco Law.

So ordered.